THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MERVYN WRIGHT, Defendant-Appellant.

First District (1st Division)   No. 1—89—1533

Opinion filed August 19, 1991.

Randolph N. Stone, Public Defender, of Chicago (R.H.R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Marilyn F. Schlesinger, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant, Mervyn Wright, was charged, tried by a jury and found guilty of first degree murder and attempted residential burglary. Defendant was sentenced to 80 years' imprisonment. Defendant appeals his conviction on the basis that (1) the trial court improperly denied his motion to suppress evidence of his prior burglary conviction, (2) he was deprived of his constitutional right to present a defense because the trial court prevented him from introducing evidence of the decedent's marital status, (3) he was improperly denied a *Batson* hearing after he made a *prima facie*

showing of racial discrimination in the State's use of peremptory challenges during jury selection, (4) Illinois' first degree murder statute is unconstitutional, (5) the trial court improperly admitted morgue pictures of decedent, and (6) he was deprived of his right to a fair trial by prosecutorial misconduct and the trial judge's bias.

Defendant was charged with attempted residential burglary and first degree murder for the September 1987 attempted break-in of a room at the Roberts Motel at 66th and Martin Luther King Drive and the shooting death of Gregory Edwards, an off-duty police officer. Prior to trial, several motions *in limine* were made by the defendant and the State.

Defendant moved to exclude defendant's prior burglary convictions from evidence. The trial court denied this motion stating that this evidence "goes to defendant's credibility." Next, defense moved to prevent the State from revealing that the decedent was an off-duty Chicago police officer. The defense argued that the evidence would be prejudicial because the jury would perceive the defendant as a "cop killer" instead of realizing the case was a burglary/murder case. The State responded that the jury would hear evidence regarding and see photographs showing the decedent's gun, holster and handcuffs located inside the motel room. The trial court denied defense's motion, explaining that if the jury was not informed that decedent was an off-duty police officer, it might assume he was a "dope dealer."

The State made a motion *in limine* to preclude defendant from raising the decedent's marital status. Defendant objected to the motion, arguing that decedent's marital status was relevant to show decedent's state of mind at the time of the shooting and in order that inferences may be drawn by the jury that decedent may have shot at defendant first and why defendant believed he had to protect himself. The trial court overruled defendant's objection and granted the State's motion. The trial court, however, informed the defendant that it would allow him to tell the jury that the victim registered under an assumed name.

In May 1989, a jury was selected. The trial court, in its introductory comments, advised the venire members that the victim was an off-duty police officer and inquired whether that fact would influence anyone's objectivity in serving on the jury. One person responded affirmatively and was dismissed. Defendant made no record of the racial composition of the venire, but did make a motion for a *Batson* hearing after the jury was sworn. The only evidence defendant presented to the court was that the State had challenged

six individuals, five of whom were black females and one who was an Indian female. Defendant stated that he thought a *prima facie* showing had been made. The State argued that there were five blacks chosen for the jury. The trial court denied the motion.

During opening statements the State noted that decedent was an off-duty police officer and that due to his profession, he possessed a gun and further that the decedent understood that the defendant's attempt to break into the room was an effort to burglarize the room. In defendant's opening statement, he also commented that decedent was an off-duty police officer and was in a motel room with a lady friend and registered under an assumed name. Additionally, defendant stated that top echelon members of the Chicago police department were potential witnesses.

After opening statements, the State called Angelia Williams to testify. Williams testified that she was present in the decedent's motel room the night he was shot. Williams testified that she was a "Miss" who was residing with her mother in September 1987. Williams stated that she met decedent in 1984 and continued a casual relationship with him until July 1987 when they began seeing one another on a more serious level. The Wednesday before decedent was killed, Williams and decedent were together and agreed to consummate their relationship the following Monday, September 28, 1987. Williams testified that she was aware that decedent was a Chicago police officer. On September 28, 1987, decedent picked her up while still in his uniform. They proceeded to the Roberts Motel, where decedent registered while Williams waited in the car. The couple went to room 114 and engaged in sexual intercourse. Decedent fell asleep afterwards until Williams woke him when she saw someone outside their room and then heard someone trying the door knob of the room.

Williams testified that decedent put on his pants and she went into the bathroom. From the bathroom, Williams heard the decedent ask if there was a problem with the door. Williams heard no response. Decedent ordered the person to get away from the door. Thereafter, Williams heard a loud noise as if the door of the motel room was being broken. This noise was followed by a gunshot and then a series of gunshots. Once the room was quiet again, Williams called out to the decedent but received no answer. Williams came out of the bathroom and saw decedent lying motionless just inside the open doorway with blood coming from his head. Williams shook the decedent, but he did not respond.

Decedent's gun was lying near his body. Fearing someone might walk into the open room, Williams threw it across the room. After attempting to get a call through to the motel's front desk, Williams ran to the office to seek help. Williams waited in the office for the police to arrive.

Dr. Barry Lifschultz, as staff forensic pathologist at Cook County medical examiner's office, testified that on September 29, 1987, he performed an autopsy on the decedent. Dr. Lifschultz found five injuries to the decedent. One gunshot wound entered the left side of decedent's head which had traveled through the brain and lodged in the skull. There was evidence of contact discharge to the decedent's skin and bone. Contact discharge occurs when the tip of a gun has been pressed directly against the target and the trigger is pulled. The second injury was an abrasion to the left side of the decedent's head which was consistent with being hit in the head by a door. The third wound was a gunshot wound which passed through the right shoulder muscle and exited out the right upper back. There was powder stippling which indicates a close-range firing of about 6 to 12 feet. The fourth injury was a bullet that entered the decedent's lung and was recovered from the left chest cavity. There was also powder stippling surrounding the external wound. The fifth injury was a gunshot wound to the left hip. The bullet was found in the abdominal cavity.

Joseph Stroter, a security guard for Great Lakes Security Company, was providing security to the Parkway Garden housing project on September 29, 1987. At approximately 12:45 a.m., Stroter saw defendant and another black man trying to flag down a car. Stroter testified that he heard the defendant scream, "Man, just stop any car. I'm shot man." Stroter saw the defendant and the other man enter an ambulance repair garage at the intersection. Stroter also noticed squad cars with flashing lights at the Roberts Motel. Stroter went to the motel, where he recognized Officer Portis.

Officer Portis told Stroter that she received a "911" message of a man shot at the Roberts Motel. Stroter directed the police to the garage, telling them he thought he knew who had committed the shooting. On the way to the garage, Stroter pointed out a man walking north on Martin Luther King Drive as the man who was with defendant earlier. The police stopped and detained the man. Stroter then went to the garage and found defendant telling several workers to take him to the hospital. Stroter offered to help defendant and asked what had happened. Defendant told Stroter that

"some bitch just went off" and shot him. Stroter turned defendant over to the police.

Officer Portis told defendant that she and her partner were Chicago police officers. Portis asked defendant what happened. Defendant acknowledged he had been shot, but that he did not know who shot him or where the shooting took place. Portis asked defendant whether he had been at the Roberts Motel. Defendant replied that he had not been there.

Detective Utter went to the hospital to question defendant. Utter gave defendant his *Miranda* warnings and asked him how he had been shot. Defendant's exact words were, "I don't know nothing, I ain't seen nothing and I ain't heard nothing." Utter left the hospital and returned later with Switowicz and Szudarski and questioned defendant regarding his wound and his whereabouts during the shooting of decedent. Defendant stated that his injury was linked to a person named "Little Bo," whom he had met earlier on the street. Defendant claimed that Little Bo told him he was going to bring a prostitute to the motel and invited him to the room. Defendant said he went to room 114 of the Roberts Motel and had sex with a woman while Little Bo was in the room. Defendant claims he left the room while Little Bo had sex with the prostitute. Defendant stated that he saw the prostitute leave the motel. Thereafter, defendant went back to room 114 and knocked, whereupon Little Bo opened the door and shot him. In response, defendant claims he pulled out his gun. Defendant asserts that he and Little Bo grappled as both fired at each other. Then defendant said he ran off. A court reporter was not present at the time defendant conveyed this information.

Detectives Szudarski, Swistowicz and Utter and Assistant State's Attorney DeGrazia interviewed Irving Brown, who was the man seen with defendant. Brown directed the above men to the alley in the rear of the Tailorite Cleaners located at 6501 South Martin Luther King Drive. Upon arrival, Brown lifted a clump of bushes and pointed to the gun lying there. This gun was identified as the gun from which the bullets found in decedent's body was fired.

Shortly after 2 p.m., Utter, Switowicz, Szudarski and DeGrazia returned to defendant's hospital room. Defendant was advised of his rights again. Defendant was told that the murder weapon had been recovered. Defendant agreed to make a court-reported statement. In the court-reported statement, defendant said that he went to the Roberts Motel to burglarize a room. Defendant stated he was

going to buy drugs from Brown. Defendant claimed that as he walked through the motel parking lot he had a verbal confrontation with a man from one of the rooms. Defendant claims when he walked back, the man stood in the doorway calling him names. The door was partially opened, and the defendant called names back at the man. Defendant then pushed the door and broke into the room. Defendant claims the man shot him, whereupon defendant grabbed the man's neck and shot back an unknown number of times, then ran.

At the close of the case, defendant objected to all the photographs of the victim. The trial court overruled the objections, noting that the pictures illustrated the close range of firing. The jury found defendant guilty of residential burglary and first degree murder. Defendant filed a motion for a new trial without oral argument. The court denied the motion.

Defendant asserts that the trial court improperly prevented defense counsel from introducing evidence regarding decedent's marital status and the fact that he was having an extramarital affair. Defendant claims this error was harmful and deprived him of his constitutional right to present a defense especially in light of the fact that the trial court allowed the State to introduce evidence that decedent was an off-duty police officer.

A defendant has the right to present a defense, present witnesses to establish a defense and to present his version of the facts to the trier of facts. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) A trial court, however, may reject offered evidence on the grounds of irrelevancy if such evidence has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. (*People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304, 308.) Evidence is relevant if it tends to make the question of guilt more or less probable. (*People v. Rodgers* (1972), 53 Ill. 2d 207, 214-15, 290 N.E.2d 251, 255.) The admission of evidence is within the sound discretion of the trial court. (*Bosel v. Marriott Corp.* (1978), 65 Ill. App. 3d 649, 654, 382 N.E.2d 587, 591.) The trial court's ruling should not be reversed absent a clear showing of abuse of discretion resulting in manifest prejudice to the defendant. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 420, 355 N.E.2d 634, 644.

■ The trial court did not abuse its discretion in granting the State's motion *in limine* to preclude defendant from introducing evidence of the decedent's marital status. Defendant argues that dece-

dent's marital status is relevant to his affirmative defense of self-defense because it illustrates decedent's state of mind or his motive to shoot at defendant first. Defendant argued at trial that decedent "may have been concerned about who may have been on the outside. Someone investigating him, somebody contacted by his wife or his wife's family, and I think we should be allowed to get into evidence the fact that [decedent] was married *** [decedent and Williams] were feeling some sort of paranoia." Evidence of decedent's marital status has little probative value due to the remoteness and uncertainty of the scenario which defendant paints as its basis for claiming its relevancy.

In spite of the trial court's ruling, the jury heard evidence from which it could infer or deduce that the decedent and Williams were having an extramarital affair at the motel. The jury heard the stipulation that decedent was registered under an assumed name at the motel. A police officer testified that he had spoken to decedent's wife at her home which implied that Williams was not decedent's wife. Moreover, Williams indicated that she was not married to the decedent and that the purpose of their rendezvous was to "get intimate" with each other. The jury heard enough evidence to come to the conclusion that decedent was having an illicit affair. Thus, regardless of the trial court's decision to exclude evidence of decedent's marital status, the jury was informed and defendant was not manifestly prejudiced. Therefore, the trial court did not abuse its discretion in excluding evidence of decedent's marital status.

■ Turning now to defendant's argument that the trial court improperly permitted the State to introduce evidence that decedent was an off-duty police officer. Defendant's theory of the case was that he was seeking money with which to purchase illicit drugs and shot decedent in self-defense. It was important that the jury understood that decedent was knowledgeable about burglaries and, therefore, went to the door of the motel room armed. Additionally, knowledge of decedent's occupation was relevant to understanding why decedent possessed a gun, holster and handcuffs. At the onset of the case, the trial court informed the venire members that decedent was a police officer and inquired whether such information would hinder their objectivity.

The case at bar is analogous to *People v. Thomas* (1985), 139 Ill. App. 3d 163, 486 N.E.2d 1362. In *Thomas*, the court found that the victim's occupation was relevant in connection with evidence expected to be introduced at trial and that since the extent of defendant's participation in the murder was at issue, the victim's occupa-

tion had probative value. (*Thomas,* 139 Ill. App. 3d at 183-84, 486 N.E.2d at 1376.) The *Thomas* court held that the defendant was not denied a fair trial by the admission of victim's occupation as a police officer. (*Thomas,* 139 Ill. App. 3d at 184, 486 N.E.2d at 1376.) Similarly, the evidence that decedent was an off-duty police officer is relevant in connection with the evidence that showed decedent possessed a gun and that a holster and handcuffs were found in the motel room. Defendant was not denied his right to a fair trial by the admission into evidence that decedent was an off-duty police officer.

■■ ■ Defendant argues that his motion to preclude the evidence of his prior burglary convictions was improperly denied. The common law record indicates that defendant was convicted of attempted burglary in October and November 1985 and in March 1986 for which he was sentenced to three years' imprisonment. Defendant was released in April 1987. Five months later he was arrested for the crimes in the case at bar. The trial judge denied defendant's motion, stating that the evidence "goes to credibility" and that the court "must weigh the prejudicial value as to the probative value." Defendant never testified. The record is devoid of any of defendant's reasons as to why he decided not to testify. The prior convictions were not admitted as evidence to the jury.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the Illinois Supreme Court adopted Rule 609 of the Federal Rules of Evidence. This rule allows a conviction which is not more than 10 years old into evidence for impeachment purposes. The crime must be punishable by death or imprisonment in excess of one year or must involve dishonesty or false statement regardless of the punishment. (*Montgomery,* 47 Ill. 2d at 516, 268 N.E.2d at 698.) The trial court must, however, determine that the probative value of the evidence of the crime is not outweighed by the danger of prejudice. (*Montgomery,* 47 Ill. 2d at 516, 268 N.E.2d at 699.) The trial court may consider such factors as the nature of the crime, the nearness or remoteness of the prior crime, the similarity to the one charged and the subsequent career of the defendant. (*Montgomery,* 47 Ill. 2d at 518, 268 N.E.2d at 699.) In the case at bar, the initial prerequisites of *Montgomery* have been met, *i.e.*, the prior burglary convictions were punishable by imprisonment in excess of one year (Ill. Rev. Stat. 1987, ch. 38, par. 19—1) and the convictions and releases occurred within the 10 years preceding the crimes in the case at bar.

Defendant argues that the trial court did not enunciate the underlying reasons for its determination and that it did not engage in the balancing required by *Montgomery*. The trial court did state that it needed to balance the prejudicial effect of the evidence against its probativeness before it denied defendant's motion to exclude his prior convictions. Moreover, it is not necessary that the reasons for the trial court's ruling appear in the record. (*People v. Hall* (1983), 117 Ill. App. 3d 788, 798, 453 N.E.2d 1327, 1336.) Furthermore, application of the facts in the record to the guidelines set forth in *Montgomery* supports the trial court's decision.

First, the nature of defendant's prior burglary convictions evinces a "disrespect for societal order and thus adversely affects [the defendant's] veracity." (See *People v. Medreno* (1981), 99 Ill. App. 3d 449, 452, 425 N.E.2d 588, 591.) Second, defendant was recently released from prison when he committed the crimes involved in the case at bar. It is well established that recency between release and arrest reflects negatively on defendant's likelihood of being rehabilitated and, thus, impacts on his credibility. (*Medreno*, 99 Ill. App. 3d at 453, 425 N.E.2d at 591; *Hall*, 117 Ill. App. 3d at 799, 453 N.E.2d at 1336.) Third, even though defendant's prior convictions are similar, it does not mean they cannot be introduced. *Hall*, 117 Ill. App. 3d at 799, 453 N.E.2d at 1337.

Defendant's argument that the trial court's ruling in favor of allowing his prior convictions to be introduced into evidence had a "chilling effect on his decision to testify" does not render the trial court's determination erroneous. (*Hall*, 117 Ill. App. 3d at 800, 453 N.E.2d at 1337.) There is no evidence in the record that defendant's reason for refraining from testifying was to avoid being impeached by his previous convictions. The trial court did not abuse its discretion in balancing the relevant factors and denying defendant's motion to exclude his prior burglary convictions. See *Hall*, 117 Ill. App. 3d at 800, 453 N.E.2d at 1337.

Defendant contends that he established a *prima facie* showing of purposeful discrimination on the basis of the State's pattern of strikes against blacks and minority females. Defendant is black. The record shows that after venire members were *voir dired*, their 14 jury cards were tendered to the State. The State excused six females, one whom the record indicates is a native of India. Aside from this one female, the record is devoid of any indication of the races of the other five venire members which the State excluded, except for defendant's representation to the court that they were black. Defendant also excused six venire members whose races are

unknown. The day after the jury was sworn, defendant made its motion for a *Batson* hearing, stating, "I noticed in my review of the people that were challenged yesterday five were black. Of the six challenges that were used by the State five peremptory challenges were used to exclude black females and one, the sixth one, an Indian female and I think a prime [*sic*] facie showing has been made." The State responded that about five blacks were sworn as jurors. The trial court denied the motion stating that it was not timely.

██ The standard for review in *Batson* hearing appeals in Illinois is whether the trial court's decision is against the manifest weight of the evidence, considering any relevant circumstances. (*People v. Brisbon* (1989), 129 Ill. 2d 200, 231, 544 N.E.2d 297, 311.) It is well-established law in Illinois that challenges to the composition of a jury must be brought before the jury is sworn. (*People v. Harris* (1989), 129 Ill. 2d 123, 170, 544 N.E.2d 357, 378; *People v. Evans* (1988), 125 Ill. 2d 50, 61-62, 530 N.E.2d 1360, 1364.) A defendant's failure to object to the State's peremptory challenges until after the jury has been sworn constitutes a waiver of his right to present a *Batson* claim. (*People v. Henderson* (1990), 142 Ill. 2d 258, 283, 568 N.E.2d 1234, 1246.) In the case at bar, the trial court commented that the motion was not made in a timely fashion and denied defendant's *Batson* claim. The State has also argued that defendant's motion lacked the timeliness required under Illinois law.

██ Furthermore, a defendant may not challenge a State's peremptory challenge as being racially motivated unless there is evidence in the record that establishes the race(s) of the excluded juror(s). (*Harris*, 129 Ill. 2d at 171, 544 N.E.2d at 378; *Evans*, 125 Ill. 2d at 62, 530 N.E.2d at 1364.) Since there is no independent evidence in the record to establish the race(s) of the jurors who the State challenged, defendant's objections to the State's challenges are waived. (See *Evans*, 125 Ill. 2d at 62, 530 N.E.2d at 1364.) Defendant waived his right to a *Batson* claim by failing to assert such claim in a timely manner and by failing to create a record of the venire members' races. The trial court's ruling was not against the manifest weight of the evidence and it properly denied defendant's motion for a *Batson* hearing.

Defendant was charged with first degree murder under the new Illinois murder statute. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) Defendant's pretrial motion arguing the above statute is unconstitutional was denied. Defendant was convicted of first degree murder. Defendant asserts that the statute is unconstitutional because it vio-

lates the principles of due process, equal protection and separation of powers.

## DUE PROCESS

■ The due process clause of the United States Constitution requires the prosecution to prove every element of a crime beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 363, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072.) Defendant argues that the Illinois murder statute violates the due process clause by exonerating the State of its constitutional burden of proving all elements of first degree murder by requiring a defendant to prove a mitigating mental state. The United States Supreme Court held that the State cannot shift to the defendant the burden of proving an element of the crime charged. (*Mullaney v. Wilbur* (1975), 421 U.S. 684, 702, 44 L. Ed. 2d 508, 521, 95 S. Ct. 1881, 1891.) *Mullaney* involved Maine statutes which recognized two forms of homicide, namely, murder and manslaughter. Each of the crimes shared two common elements; each crime had to be unlawful and each had to be intentional. If the State proved each of those elements beyond a reasonable doubt, then the jury could compare the differences between the two crimes. Malice aforethought was an essential element of murder to be *conclusively implied* unless the defendant proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. If the defendant made an adequate showing of heat of passion on sudden provocation, the jury could only convict defendant of manslaughter. Thus, the Court held that the statute affirmatively shifted the burden of proof to the defendant and required him to prove the critical fact in dispute. *Mullaney*, 421 U.S. at 701, 44 L. Ed. 2d at 520, 95 S. Ct. at 1890.

The United States Supreme Court did, however, uphold a New York statute which required a defendant charged with second degree murder to prove by a preponderance of the evidence an affirmative defense of emotional disturbance in order to reduce the crime to manslaughter. (*Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319.) The mitigating factors which reduce the crime from murder to what was previously called manslaughter are not elements of the offense, but rather affirmative defenses a defendant can raise if he chooses but which have no bearing on the ultimate burden of proof. *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.

When a defendant is charged with first degree murder and seeks to present evidence to reduce his conviction, the Illinois statute functions as an affirmative defense against the first degree murder ele-

ments. A defendant can request that the jury be given the option of finding him guilty of second degree murder instead of first degree murder. Under such circumstances, the jury must be instructed that it cannot consider whether the defendant met his burden of proving mitigating factors by a preponderance of the evidence, unless the jury first determines that the State has proven each element of first degree murder beyond a reasonable doubt. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2.) It is within the State's constitutional power to place the burden of proving affirmative defenses on a defendant. (*People v. Smith* (1978), 71 Ill. 2d 95, 374 N.E.2d 472.) Therefore, the Illinois murder statute in question does not violate defendant's due process rights and, therefore, is not unconstitutional.

## EQUAL PROTECTION

Defendant asserts that the new Illinois murder statute violates the equal protection clause of the United States and Illinois Constitutions by unjustifiably shifting the burden of proof to defendants who are charged with first degree murder when those accused of other crimes do not experience such a shift. Invidious discrimination against a class of individuals is prohibited by the equal protection clauses. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.

A person or class of persons is denied equal protection by a State statute when the statute arbitrarily discriminates against that person or class of persons by withholding some benefit or privilege which the State gives to all others. (*In re Powell* (1988), 126 Ill. 2d 15, 533 N.E.2d 831; *Bilyk v. Chicago Transit Authority* (1988), 125 Ill. 2d 230, 531 N.E.2d 1.) When being subjected to the traditional equal protection tests, statutes carry a presumption of rationality, and it is the defendant's burden to demonstrate the impermissible nature of the classification created. (*People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11.) This case does not involve a statute directed at a suspect class nor does the statute in question threaten a fundamental constitutional right. (*People v. Clark* (1991), 207 Ill. App. 3d 439, 448, 565 N.E.2d 1373, 1378.) The State has a compelling interest in the fair, reliable and efficient regulation of criminal activity. *Clark*, 207 Ill. App. 3d at 447, 565 N.E.2d at 1378.

■ There is no presumption of guilt in the first degree murder statute which must be rebutted by defendant. (*Clark*, 207 Ill. App. 3d at 448, 565 N.E.2d at 1379.) The State must prove all the elements of first degree murder. After the State has accomplished this, a defendant has the opportunity to prove mitigating circumstances by a preponderance of the evidence. Defendant mistakenly asserts that a

defendant can only be found guilty of second degree murder if he both alleges and proves it himself. This is not so; the State can charge a defendant with second degree murder. (*People v. Burks* (1989), 189 Ill. App. 3d 782, 545 N.E.2d 782.) Defendant has failed to show that Illinois' new murder statute violates equal protection and, therefore, is not unconstitutional on this basis.

### SEPARATION OF POWERS

■ Defendant argues that the Illinois murder statute prohibits the State from charging defendants with second degree murder, thus removing the State's discretion in charging defendants under the statutes, and therefore, violating the separation of powers clause. In *Burks*, the court held that Illinois prosecutors have the right to charge defendant with the crime of second degree murder. (*Burks*, 189 Ill. App. 3d at 785, 545 N.E.2d at 784.) By charging a defendant with second degree murder, the State is alleging that it can prove the elements of first degree murder, but is conceding the presence of mitigating circumstances. (*Burks*, 189 Ill. App. 3d at 785, 545 N.E.2d at 784; *Clark*, 207 Ill. App. 3d 439, 565 N.E.2d 1379.) We find that the Illinois first degree murder statute does not violate the separation of powers clause and is not unconstitutional.

Defendant contends that the trial court improperly admitted photographs of decedent's body. Photographs, even gruesome ones, are properly admitted where they are relevant to establish any fact at issue, even when defendant does not refute the victim's identity or his cause of death. *People v. Williams* (1985), 137 Ill. App. 3d 736, 484 N.E.2d 1191.

■ In *Williams*, photographs were held to be properly admitted where they corroborated testimony as to the cause of death, number and location of wounds and the manner in which they were inflicted. (*Williams*, 137 Ill. App. 3d at 745, 484 N.E.2d at 1198.) In the case at bar, the photographs illustrated the cause of death, number of bullet wounds, location of those wounds and that they were inflicted at a close range. This evidence is essential to prove that defendant's actions were intentional and not simply self-defense or committed during mutual combat.

Defendant relies on *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, to assert that the trial court improperly admitted the disputed photographs. In *Garlick*, the defendant admitted to killing the victim and was asserting an insanity defense. Thus, the only purpose served by publishing the photographs to the jury in the *Garlick* case was to inflame and prejudice the jury. Here, defendant

claimed he shot decedent in self-defense. The photographs served the purpose of illustrating that defendant's gun was pressed against decedent's head when he pulled the trigger, thus negating the probability that defendant shot decedent in self-defense. Therefore, we hold that the trial court did not err in allowing the disputed photographs to be admitted into evidence.

Defendant raises two claims of prosecutorial misconduct in closing arguments and accuses the trial judge of unfair bias against him. A prosecutor is granted wide latitude in making closing arguments, and the trial court's determination as to the prejudicial effect will generally be followed absent a clear abuse of discretion. (*People v. Bracy* (1986), 152 Ill. App. 3d 566, 575-76, 504 N.E.2d 764, 770.) Arguments based on facts or reasonable inferences drawn from the facts are proper even when they reflect unfavorably on the accused. *Bracy*, 152 Ill. App. 3d at 576, 504 N.E.2d at 770-71.

Defendant first contends that the State conveyed the idea that defendant was lying when he pled not guilty. The record discloses that the State's comments were part of a lengthy dissertation of the evidence upon which the State based his assertion that defendant was lying. A prosecutor may state his opinion that a defendant is lying if it is based on the evidence. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.) The State reviewed for the jury evidence that defendant claimed he intended to burglarize a room to obtain money for drugs but was now claiming that he was not committing a forcible entry. Additionally, there was evidence that defendant did break into the motel room. The State then illustrated how unbelievable defendant's position was by commenting, "[n]ow keep in mind right now [defendant] is saying, I am the victim here *** I'm the guy who was attacked by some mad man."

The State also argued that defendant had lied by obstructing justice in hiding evidence, namely the murder weapon, and by pleading not guilty by virtue of his self-defense theory. The State, thus, was not stating an opinion unsupported by evidence. Additionally, the trial court stated, "Every defendant's [*sic*] entitled to a fair trial, counsel. Come on." Furthermore, the trial court instructed the jury that closing arguments are not evidence and that any argument or statement made by an attorney which is not based on the evidence should be disregarded. (Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2d ed. 1981).) This type of instruction can cure potential prejudice where improper statements have been made. (*Bracy*, 152 Ill. App. 3d at 576, 504 N.E.2d at 771.) The evidence in the case at bar is so overwhelming that the verdict would not have been different had the State not

made the disputed comments; therefore, the State's arguments did not deny defendant of his constitutional right to a fair trial. *Bracy*, 152 Ill. App. 3d at 577, 504 N.E.2d at 771.

Defendant also argues that the State's comments on defense counsel's cross-examination of Williams were prejudicial. The following are the State's comments in pertinent part:

> "And Angela Williams, do you think it was easy for her to come in this court and get on that witness stand and tell you all about her relationship with [decedent] and tell you what they were doing there that night and why they went there and what she had to experience? You think it was easy for her to get up there and withstand [defense counsel's] cross-examination, [defense counsel's] little insinuations, [defense counsel's] cheap shots that she was doing something?"

Defendant objected to the above comment. The trial court responded that it was "fair comment." Remarks which suggest that defense counsel is trying to divert the jury's attention from the facts or fabricate a defense theory are unfair and prejudicial unless based upon the evidence. *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.

The above remarks were based on the evidence. When defense counsel cross-examined Williams, he questioned her in a manner which would remind the jury that she and decedent had gone to the motel to consummate their relationship. For example, defense counsel asked, "Did [decedent] put on his shorts and his pants?" and "Do you know where [decedent] lives?" and "[D]id you ever go to [decedent's] apartment or home?" These questions had little if any relevance. These questions appear to have been designed to remind the jury of the nature of decedent's and Williams' rendezvous at the motel.

In defense counsel's closing argument, the following argument and objections took place:

> "DEFENSE ATTORNEY: Here's a woman who has known the victim for three years. And [the State] asked her yes, we're at 58th and King Drive—I'm sorry 58th and Lake Shore Drive. Our relationship is close and we want to get closer. So we're discussing about getting intimate on Wednesday. So they decided to become intimate on the following Monday. He picks her up at 8:30. He's registered at the hotel under a different name shortly after nine. And they're in room 114. Got something to hide, he suggests.
>
> ASSISTANT STATE'S ATTORNEY: Objection, Judge.

DEFENSE ATTORNEY: They chose this elegant surroundings of the Roberts Motel to get intimate. And what is her reaction at midnight and she sees this figure outside? Here after all they're only there so that the relationship can get closer. That's all they're there for, if you're to believe her story.

ASSISTANT STATE'S ATTORNEY: Objection, Judge. She and the victim are not on trial.

THE COURT: [The State] will have the opportunity to respond. Come on."

A defendant cannot ordinarily claim error where the State's remarks are made in reply to or may be said to have been invited by defense counsel's argument. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180, 183; *People v. Vriner* (1978), 74 Ill. 2d 329, 344, 385 N.E.2d 671.) Defendant also failed to show how any of these comments adversely affected his trial or that the outcome would have been different had the State not made the disputed comments. We find that not only were the State's comments based on evidence that the defense counsel did, in fact, cross-examine Williams in a manner only to remind the jury of the nature of her relationship with defendant, but that the State's comments, in the context in which they were made, were proper rebuttal invited by defense counsel's argument.

■■ Defendant claims that the trial judge was hostile to him and his counsel. Defendant, however, failed to cite any authority to support his claim. The Illinois Supreme Court has held that "every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327.) The trial court is in a better position than a reviewing court to determine the prejudicial effect of evidence or argument. (*Smothers*, 55 Ill. 2d at 176, 302 N.E.2d at 327.) The trial court's decision, therefore, will be upheld absent an abuse of discretion. (*Smothers*, 55 Ill. 2d at 176, 302 N.E.2d at 327.) Defendant raises the same issues which have been discussed above as evidence that the trial judge was hostile to him and defense counsel. We hold that the trial judge ruled properly on those issues, that defendant failed to show any acts of misconduct by the trial judge and that defendant was not denied a fair trial.

For the foregoing reasons, the trial court's decisions and defendant's conviction are affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.