THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES HOOKER, Defendant-Appellant.

First District (3rd Division)   No. 1—91—3241

Opinion filed June 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Lester Finkle and Tina Liebling, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, Kelly S. Caner, and Michael R. Slovis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Charles Hooker was convicted of first degree murder for the shooting death of Kiwana Allen.

On appeal, defendant asserts that (1) he either acted in self-defense or should have been guilty of only second degree murder; (2) the second degree murder statute is unconstitutional because it requires a defendant to prove that his belief in the need for self-defense was unreasonable; and (3) the second degree murder statute unconstitutionally shifts the burden of proving a certain mental state to the defendant.

For the reasons which follow, we affirm defendant's conviction for first degree murder and find that the second degree murder statute is constitutional.

The victim, Kiwana Allen, died from multiple gunshot wounds which he sustained about 7:30 a.m. on August 19, 1989, in front of an apartment building at 2910 South Dearborn, a Chicago Housing Authority unit with nine floors.

At trial the State presented the testimony of two eyewitnesses, Tobias Hall and Randall Jones, and two police officers, Victor Roden and Gary Butler, who investigated Allen's murder.

Tobias Hall observed the victim and defendant talking in front of 2910 South Dearborn and also saw Bobby Williams near the building. Hall heard defendant say "Why ya'll put my woman in this?" and heard the victim say "Your woman ain't got nothing to do with this."

Hall then saw defendant reach into his jacket, remove a gun, point the gun at the victim's head, and fire. At that time, the victim and defendant were about one foot apart from each other. After the shot, the victim attempted to turn and run but defendant kept firing his weapon. When the victim fell to the ground, Hall saw defendant run into the building behind him. Hall never saw the victim or anyone else, except defendant, in the area with a gun and denied that Bobby Williams picked up a gun next to the victim after the shooting. Hall testified that he had never seen the victim with a gun nor to his knowledge did the victim own one.

Randall Jones, the second occurrence witness, corroborated the testimony of Hall. Jones lived in the 2910 South Dearborn building and knew both defendant and the victim. While looking out the sixth-floor window of 2910 South Dearborn, Jones saw defendant and the victim talking to each other but was unable to hear any part of their conversation. Jones also saw defendant reach into his jacket and remove a gun. The victim then took a step back, raised his hands, and began to turn away. Defendant aimed and fired his gun at the victim's head. Defendant continued to shoot about three or four times at the victim and then shot once at Hall, who was standing behind defendant at that time. The victim did not have a gun nor did the victim reach for anything on his body.

Jones was aware that defendant and the victim had previous arguments concerning Cindy Wade Hooker, the then girlfriend of defendant, who later married defendant, but had never personally heard them argue. Jones also had never seen the victim with a gun either before or at the time of the shooting. Jones did not know

Bobby Williams and only saw three people at the scene of the shooting, *i.e.*, defendant, the victim and Hall.

Both eyewitnesses, Hall and Jones, testified that they were not members of the Mickey Cobra street gang, although the victim was.

Victor Roden testified that he was one of the police detectives assigned to investigate this case. Roden stated that Hall identified defendant as the shooter on the morning of the shooting. When Roden interviewed Cindy Wade Hooker, she stated she had no personal knowledge of the shooting but had heard about it.

Gary Butler, a police officer, testified that he interviewed Cindy Wade Hooker on the day of the murder at her apartment at 2920 South State, which is the building next to 2910 South Dearborn. Cindy took the officer to two different houses in an unsuccessful search for defendant. Cindy then took the officer to another apartment in her building where they recovered a .38-caliber revolver which defendant had brought to her a few minutes after the shooting of the victim.

The defense presented three witnesses, Joshua Taylor (defendant's younger brother), Cindy Wade Hooker (defendant's wife), and Charlotte Bush (a next-door neighbor of defendant's wife Cindy for 15 years).

Joshua Taylor, the younger brother of defendant, was 11 years old at the time of the shooting and 13 years old at the time of trial. At the time of the murder, Joshua lived in the 2910 South Dearborn building with his mother and sister while defendant, his brother, lived in Woodridge.

On the morning of the murder, defendant and his girlfriend, Cindy, arrived at the building to go to Great America with Joshua and other people. From inside the building, Joshua saw defendant talking to the victim and also saw Bobby Williams sitting outside the building when Tobias Hall arrived.

Joshua heard defendant and the victim accuse each other's friends of "shooting at" the other. According to Joshua, the victim then took about five steps back from where he was standing, pulled up the back of his shirt and took out a gun. Defendant then pulled out his gun, aimed it at the victim, and "popped one time." The victim "was clicking the trigger" so defendant shot two more times. Then the victim started backing up, Bobby Williams shot about four times at defendant, and Hall also fired a gun of a different caliber about 12 or 13 times.

Later that same day, Joshua told the police that defendant had first only fired in the air when actually Joshua saw defendant aim his

gun at the victim. At trial Joshua testified that he had told a series of lies to the police when he was first interviewed and that he knew defendant, his brother, was a murder suspect. During a second interview, Joshua admitted that he had changed his story.

Joshua also testified that the victim was backing up even before defendant pulled out his gun and that he lied to the police about defendant firing a shot into the air. Joshua stated that defendant fired three times at the victim, striking him only in the leg, and that Bobby Williams shot the victim in the head.

Joshua identified the victim, Tobias Hall, Randall Jones, and Bobby Williams as members of the Mickey Cobra street gang and stated that the Mickey Cobras dominate the buildings at 2910 South Dearborn and 2920 South State. Joshua identified the initials "MCK" located on the side of defendant's gun as meaning Mickey Cobra Killer.

Cindy Hooker, formerly Cindy Wade before her marriage to defendant on June 1, 1990, testified that before July 1989 she lived with her mother at 2920 South State. Cindy did not see the shooting.

Cindy knew the victim all of her life and was his girlfriend until May 16, 1989. Cindy testified that the victim was a member of the Mickey Cobra street gang and carried a gun every day she was dating him.

In June or July of 1989, Cindy was with defendant near the 2930 building when Randall Jones, the victim, and Lawrence Carter began shooting at defendant. Cindy and defendant moved to Woodridge because she was tired of the victim bothering her. Prior to their move, Cindy had filed about five complaints against the victim and had appeared in court against the victim about three times.

Shortly before 7 a.m. on the morning of the incident, Cindy arrived with defendant from Woodridge to 29th and State to go to Great America. Cindy then went alone to her sister's house at 2920 South State and upon arriving heard five or six gunshots. Defendant then appeared at Cindy's sister's house and gave Cindy his gun. Subsequently, Cindy called a police detective she apparently knew and furnished him defendant's gun.

Charlotte Bush testified that she did not actually see the shooting. Charlotte lived next door to Cindy Hooker for about 15 years but they were not exactly good friends. Although Charlotte and the victim were close friends, she did not know the victim to be a member of a gang.

Charlotte was looking out a window from her apartment on the morning of the murder and could see the 2910 building. She observed

the victim, Hall, Bobby Williams, and a fourth person who looked like defendant. Her attention was diverted from the scene when she heard three shots and ducked. After a minute, Charlotte looked outside, saw the victim bent over, and saw Hall and Williams walking toward 2910. Charlotte ducked again when she heard four more shots which sounded different than the first series of gunshots. When she looked out the window again, Charlotte observed the victim on the ground and Hall and Williams were trying to help the victim. The fourth person was now gone.

Hall and Williams then came under Charlotte's window and they were crying. Williams told Charlotte that he didn't do it and that the victim was his best friend. Charlotte saw Williams holding something resembling a gun and she called the police.

Charlotte never saw defendant's brother (Joshua) or defendant but saw someone resembling defendant. Charlotte never saw Hall with a gun nor could she positively say that Williams had a gun.

In rebuttal, the State called Victor Roden, a police detective, who conducted three interviews with Joshua Taylor. Roden testified that during the course of interviews, Joshua had told approximately three versions of the events that transpired and kept changing his story.

The parties stipulated that the medical examiner would testify that the cause of death was multiple gunshot wounds, that four gunshot wounds were visible, that one bullet recovered from the victim's skull was small caliber and another recovered bullet was medium caliber, and that the bullets were all deformed.

The parties further stipulated that two evidence technicians would testify that the recovered gun revealed that three bullets had been discharged and three live bullets remained in the gun.

Following closing arguments, the trial court found defendant guilty of first degree murder.

On appeal, defendant first asserts that he was not proven guilty of first degree murder beyond a reasonable doubt because he acted in self-defense against a gang-related attack from the victim and other members of the Mickey Cobra street gang. Alternatively, defendant maintains that even if his belief that his life was in imminent danger was unreasonable, a conviction for second degree murder would have been appropriate.

The State contends that the evidence (1) proved beyond a reasonable doubt that defendant committed first degree murder, (2) rebutted defendant's claim of self-defense, and (3) established that defendant's actions did not qualify under the statute to reduce the crime to second degree murder.

Where a criminal defendant challenges the sufficiency of evidence on appeal, the conviction will be overturned only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Schott* (1991), 145 Ill. 2d 188, 203, 582 N.E.2d 690.) The relevant inquiry on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Schott*, 145 Ill. 2d at 203; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

The crime of first degree murder occurs when a person kills an individual without lawful justification and he either intends to kill or do great bodily harm to that individual, or knows that such acts will cause death to that individual, or knows that such acts create a strong probability of death or great bodily harm to that individual. Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2).

Self-defense is an affirmative defense (Ill. Rev. Stat. 1989, ch. 38, par. 7—14) which is raised when (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm is imminent; (4) the person threatened must actually believe (a) that a danger exists, (b) the use of force is necessary to avert the danger, and (c) the kind and amount of force which he uses is necessary; and (5) the above beliefs are reasonable (*People v. Guzman* (1990), 208 Ill. App. 3d 525, 531, 567 N.E.2d 500).

Self-defense, once raised, places the burden upon the State to disprove it beyond a reasonable doubt. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) The State carries its burden of proof to refute the defense of self-defense where it is able to negate even one of these elements. *People v. Tucker* (1988), 176 Ill. App. 3d 209, 216, 530 N.E.2d 1079.

The issue of self-defense is always a question of fact determined by the trier of fact. (*People v. Felella* (1989), 131 Ill. 2d 525, 534, 546 N.E.2d 492.) Specifically, the reasonableness of a defendant's subjective belief that he was justified in using deadly force is a question of fact. (*People v. Sawyer* (1986), 115 Ill. 2d 184, 193, 503 N.E.2d 331.) Moreover, where, as in the present case, the testimony of the witnesses conflicts, the trial judge, as the trier of fact in a bench trial, must determine the credibility of the witnesses, weigh their testimony, draw reasonable inferences, and resolve conflicts in the evidence. (*Felella*, 131 Ill. 2d at 534.) We will not substitute our judgment for that of the trial court where the evidence is conflicting (*Felella*, 131 Ill. 2d at 534) because it is not the function of a

reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt (*People v. Furby* (1990), 138 Ill. 2d 434, 455, 563 N.E.2d 421).

■■ In the present case, Tobias Hall and Randall Jones testified that they were not members of the Mickey Cobra street gang but the victim was, they actually witnessed the murder, defendant fired multiple shots at the victim even after the victim attempted to flee or retreat, and they had never seen the victim with a gun. Detective Roden testified that on the morning of the murder, Hall identified defendant as the shooter. Officer Butler testified that while interviewing Cindy Wade Hooker on the day of the murder, she retrieved the gun which defendant gave to her a few minutes after the victim was shot.

Two of the three defense witnesses, Cindy Wade Hooker and Charlotte Bush, made no claim that they had witnessed the shooting incident. Moreover, the trial judge discounted Cindy's and Charlotte's testimony. As to Cindy Hooker, the trial judge found that she "doesn't know too much about anything other than the defendant brought her the gun." In addition, the trial judge noted that she "must take into consideration [Cindy's] credibility, she's the Defendant's wife." However, Cindy provided evidence of the victim's antagonism toward defendant and a prior course of aggressive conduct because of the relationship she previously maintained with the victim. In considering the testimony of Charlotte Bush, the trial judge noted that she observed very little and never told the police the story she testified to "from the witness box."

Joshua Taylor, the brother of defendant, was the only witness who testified that the victim had a gun but also admitted at trial that he had told a series of lies to the police and that the victim was backing up even before defendant pulled out his gun. The trial judge specifically found that the testimony of Joshua was "totally unbelievable." The trial judge also noted that Joshua had told "totally different stories while he was on the bench" and when he was interviewed by the police.

Regarding the physical evidence, the parties stipulated that two evidence technicians found three discharged cartridges and three live shells, all .38-caliber bullets, in defendant's gun after the shooting. The parties also stipulated that the medical examiner observed four visible gunshot wounds. Only two bullets, however, were recovered from the victim's body, one bullet located in the back of the victim's neck and one bullet discovered in the back of the victim's head. The medical examiner would describe one recovered bullet

"as a small caliber, deformed, lead bullet" and the other bullet "as a medium-caliber bullet."

This evidence, according to defendant, leads to the inevitable conclusion that someone other than defendant fired a bullet into the victim because three bullets cannot cause four gunshot wounds and the recovered bullets were of different calibers.

The record, however, also reveals that the medical examiner "observed an entry gunshot wound to the victim's calf portion of his left leg, with a corresponding exit wound to the front portion of the left leg." The bullet which accounted for these two wounds, the entry and the exit wounds, was not recovered. These two wounds would account for the medical examiner's count of four wounds even though only three bullets struck the victim. Accordingly, the three bullets missing from defendant's gun would correspond with the number of wounds sustained by the victim.

As to the apparent difference in the caliber of the two recovered bullets, the medical examiner would also testify that each bullet was "deformed when he found them in the skull." The trial judge also observed that "the bullets are pretty well smashed." Detective Roden testified that a .38-caliber revolver, the standard issue for the police department and the type of gun recovered from defendant, would be considered a medium caliber weapon. Roden testified that deformed bullets are not always capable of being identified as a certain caliber. From his observation of the two recovered bullets, Roden testified that one bullet was unidentifiable because it had "no shape to it whatsoever." Roden surmised, but could not state with certainty due to its incomplete form, that the other bullet was a .38-caliber. Accordingly, the caliber of the two bullets recovered from the victim's body was not established with certainty except that the medical examiner and Roden agreed that one of them was a medium-sized, .38-caliber bullet.

From our review of the evidence, in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the essential elements of first degree murder were established beyond a reasonable doubt and that the State sufficiently refuted the defense of self-defense.

Defendant alternatively asks this court to find that he acted on the unreasonable belief that deadly force was necessary because his life was in danger from three antagonistic gang members, i.e., the victim, Tobias Hall and Bobby Williams. Based on this unreasonable belief, defendant asks this court to reduce his conviction to second degree murder.

Second degree murder occurs when the defendant commits the offense of first degree murder while believing that the circumstances at the time of the killing would legally justify or exonerate the killing but the defendant's belief was unreasonable. Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2).

Second degree murder is distinguished from self-defense only in terms of the nature of defendant's belief at the time of the killing. (*Felella*, 131 Ill. 2d at 534.) If the defendant's belief as to the use of force was reasonable, self-defense may apply. If the defendant's belief was unreasonable, a conviction of second degree murder may be appropriate.

Supreme Court Rule 615(b)(3) empowers a reviewing court to reduce the degree of the offense of which a defendant was convicted. (134 Ill. 2d R. 615(b)(3).) This power, however, should be used with extreme caution and only in rare instances. *People v. Williams* (1991), 222 Ill. App. 3d 129, 138, 582 N.E.2d 1158.

The power to reduce the degree of the offense is available where a lesser-included offense is involved, where there is an evidentiary weakness with regard to an element of the offense charged, and where the trial judge has expressed dissatisfaction with imposing the mandatory minimum sentence. (*Williams*, 222 Ill. App. 3d at 138-39.) Specifically, the power to reduce a conviction of first degree murder to second degree murder should be cautiously exercised. *People v. Greene* (1987), 160 Ill. App. 3d 1089, 1098, 513 N.E.2d 1092.

■ We find no evidentiary weakness in the present case to suggest that we should reduce the first degree murder conviction. The evidence sufficiently established that defendant, and only defendant, had a gun and repeatedly fired it at the victim as he sought to retreat. The evidence was neither closely balanced nor insufficient to find defendant guilty of first degree murder beyond a reasonable doubt. Moreover, defendant does not contest his sentence nor does the record indicate any reluctance on the part of the trial court to impose a sentence within the mandatory range. Accordingly, we find that the offense for which defendant was convicted should not be reduced.

Defendant next challenges the constitutionality of the second degree murder statute on the grounds that the second degree murder statute requires the defendant to prove that his belief in self-defense was unreasonable and that the unreasonableness of a defendant's belief will always be proved, if at all, by the State. This statutory scheme, defendant argues, creates a "reverse" *Reddick*

error, referring to *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, and violates due process.

In *Reddick*, the Illinois Supreme Court held that the pattern jury instructions regarding murder and voluntary manslaughter misstated the State's burden of proof by incorrectly informing the jury that the State was required to prove the conditions which would reduce murder to manslaughter. The jury instructions should have placed the burden on the State to disprove the mental conditions that reduce the offense of murder to manslaughter. *Reddick*, 123 Ill. 2d at 197; see also *People v. Shields* (1991), 143 Ill. 2d 435, 442, 575 N.E.2d 538.

The present case was a bench trial. Thus, no jury instructions were given and defendant's reliance on *Reddick*, a case involving the validity of jury instructions, is misplaced. As conceded by defendant at oral arguments, a trial court is presumed to follow the law correctly. *People v. Blount* (1991), 220 Ill. App. 3d 732, 745, 580 N.E.2d 1381.

■ As to the merits of defendant's contention, we observe that numerous appellate courts have considered and rejected arguments which maintained that the second degree murder statute violates due process. (*E.g., People v. Davis* (1991), 221 Ill. App. 3d 1023, 583 N.E.2d 64; *People v. Guidry* (1991), 220 Ill. App. 3d 406, 581 N.E.2d 38; *People v. Willis* (1991), 217 Ill. App. 3d 909, 926, 577 N.E.2d 1215 (and cases cited therein); *People v. Cook* (1991), 217 Ill. App. 3d 299, 576 N.E.2d 1242.) Given the abundance of authority holding that the second degree murder statute does not violate a defendant's constitutional rights to due process of law, we decline to expound at length on the present defendant's analogous argument.

Due process requires the State to prove beyond a reasonable doubt all elements included in the definition of the offense with which the defendant is charged. (*People v. Mitchell* (1991), 221 Ill. App. 3d 926, 931, 583 N.E.2d 78; *People v. Brown* (1991), 218 Ill. App. 3d 890, 896-97, 578 N.E.2d 1168.) The second degree murder statute in Illinois expressly states that "the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c).

Following *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, this court specifically held that "it is constitutional to require the defendant to prove [mitigating factors] by a preponderance of the evidence in order to reduce the first de-

gree murder charge to second degree murder." *Brown*, 218 Ill. App. 3d at 897.

We recognize the unique dichotomy presented by the interplay between the affirmative defense of self-defense predicated on a reasonable belief in self-defense (Ill. Rev. Stat. 1989, ch. 38, par. 7—1) and the mitigating factor of second degree murder based on an unreasonable belief in self-defense as enunciated in section 9—2(a)(2) (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2)).

We acknowledge the curiousness of any rule that requires a person to show that he acted unreasonably. However, shifting this burden to the defendant does not impair his right to a fair trial or deny him due process.

■ Finally, defendant asserts that the second degree murder statute is unconstitutional because it places upon the defendant the burden of proving that he lacked the requisite mental state for first degree murder by proving the existence of one of the statutory mitigating factors enunciated in the second degree murder statute (Ill. Rev. Stat. 1989, ch. 38, par. 9—2), relying on *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881. We disagree.

Defendant concedes that appellate courts have previously rejected this argument. This court has found that the Illinois second degree murder statute is substantially the same as the statute at issue in *Patterson* (432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319), rather than the statute in *Mullaney* which our courts have distinguished. (*Mitchell*, 221 Ill. App. 3d 926, 583 N.E.2d 78; *Brown*, 218 Ill. App. 3d 890, 578 N.E.2d 1168.) The statute held unconstitutional in *Mullaney* required the defendant to disprove an element of murder before the charge would be reduced to manslaughter. In contrast, the *Patterson* court held that it is constitutional to require the defendant to prove by a preponderance of the evidence an affirmative defense which is a mitigating factor to reduce murder to manslaughter. *Mitchell*, 221 Ill. App. 3d at 930-31; *Brown*, 218 Ill. App. 3d at 896.

This court specifically rejected the defendant's argument that the Illinois murder statute is constitutionally infirm by requiring a defendant to prove a mitigating mental state. *People v. Wright* (1991), 218 Ill. App. 3d 764, 776-77, 578 N.E.2d 1090.

Moreover, this court and other appellate courts have repeatedly found that under the statute, the State has the burden of proving the essential elements of the crime of first degree murder and no constitutional violation arises from requiring the defendant to prove

a mitigating factor to reduce the offense to second degree murder. *People v. Smallwood* (1991), 224 Ill. App. 3d 393, 586 N.E.2d 636; *People v. Manley* (1991), 222 Ill. App. 3d 896, 584 N.E.2d 477; *Mitchell*, 221 Ill. App. 3d 926, 583 N.E.2d 78; *Wright*, 218 Ill. App. 3d 764, 578 N.E.2d 1090; *Willis*, 217 Ill. App. 3d 909, 577 N.E.2d 1215; *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.

For all the foregoing reasons, we affirm the conviction of first degree murder and find the second degree murder statute constitutional.

Judgment affirmed.

RIZZI and CERDA, JJ., concur.