THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE MULLEN, Defendant-Appellant.

First District (5th Division)   No. 1—86—3326

Opinion filed June 2, 1989.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Carol L. Gaines, and James M. Sanford, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant Willie Mullen appeals his conviction for murder and his sentence of 24 years' imprisonment, arguing that (1) he was denied a fair trial because the State, in "defiance" of a specific ruling of the trial court, commented in closing argument that a witness was afraid to testify and (2) the trial court erred in entering judgment and sentence on two counts of murder since there was only one victim. For the reasons set forth below, we reverse and remand the cause for a new trial.

In the early morning hours of August 19, 1985, Ernest Jones was

fatally shot. Defendant, James Crockett, and Manuel Rios were charged with Jones' murder. On April 24, 1986, Crockett pleaded guilty to the murder and was sentenced to 22 years' imprisonment. Defendant and Rios were tried by separate juries during a simultaneous trial.

At trial, the State presented three eyewitnesses to the shooting; Cortez (Keith) Lee, age 15; Tyrone Carr, age 14; and Michael Howard, age 15. Lee testified that on August 18, 1985, at approximately 7:30 p.m., he, Carr and Howard went together to a roller-skating rink located on Pulaski Road in Chicago. They left the rink at midnight and went to a tavern located at Ohio and St. Louis Streets. Lee saw Willie (Lee Lee) Ford at the tavern; he knew him "from around the neighborhood." Ford appeared nervous. Lee then heard a gunshot, turned to a gangway where it appeared to have come from, and saw Manuel Rios and Ernest Jones. Jones was walking or running when Lee saw Rios shoot him "two more times." Lee then ran to Tyrone Carr's house, which was nearby. Lee further stated on cross-examination that he saw a car turn out of an alley and that after Rios shot Jones he jumped into Mullen's (defendant's) car. On objection by defense counsel, the jury was told to disregard these statements since there had been no testimony on direct examination concerning a car.

Tyrone Carr's testimony mirrored Lee's concerning the roller-skating rink, except for his further testimony that James Rios was also with them. Immediately after this testimony, Carr refused to testify further. As a result, the court, outside the presence of the jury, appointed a public defender to advise Carr of the consequences of his continuing refusal to testify. After Carr consulted with the public defender, the court held an in-chambers conference during which Carr stated he was afraid to testify. The court then explained the Witness Protection Program to him and continued the case until he could consult with his father. When Carr agreed to testify the next day, the court instructed counsel not to ask Carr any questions or make any reference concerning his reluctance to testify and, if they did, it would grant any motion for a mistrial.

Carr subsequently testified that he left the roller-skating rink on foot with Lee and Michael Howard, intending to go to a friend's house at St. Louis and Ohio Streets. While in the area of that intersection, he saw Ernest Jones coming out of the alley between St. Louis and Drake Streets; Rios was in a crouching position behind Jones; Rios said something to Jones and Jones stopped walking and turned around; he heard Jones say "Forget about it" and start to

walk away; Rios then shot Jones; Jones started to run and Rios fired again; Rios and Lee Lee Ford then ran to a blue Chevy, which had pulled up, and, as the car drove off, he ran to his home.

Carr further stated he had known Rios from around the neighborhood for three to four years; he had seen the blue Chevy in the neighborhood 10 or 30 times; he had seen several different people driving the car, including defendant, and that the car belonged to defendant; and that he did not see defendant driving the car on the night of the shooting. Carr also admitted that he lied about the incident to the police on August 19 because he was afraid to get involved, but that he told the police the truth on August 21.

Michael Howard testified that he and Carr went to the roller-skating rink together, met Keith Lee there, and the three of them left the rink on foot for Carr's house at midnight. As they were walking down Ohio Street approaching St. Louis, he saw Rios in the alley between St. Louis and Drake Streets on the same side of the street as a tavern. (Howard also stated on cross-examination that he did not see Rios until after he heard a gunshot.) At the same time, he also saw a blue Chevy in the alley, but he was 15 feet away from it and could not see who was in it. He then slowed down because he was afraid of Rios; he heard a gunshot and turned around; he saw Rios standing with a gun in his hand next to a body; he then saw defendant standing next to Rios; Rios handed the gun to defendant and he saw a flash and heard two more shots; and that Rios, defendant, and a third person whom he did not know drove off in the Chevy, the driver of which was defendant. Howard then ran to Carr's house.

Howard's testimony also indicated that his friends ran away after hearing the first shot, but he only continued walking and then turned around to look; he did not begin to run until after the third shot; when Rios handed the gun to defendant, he (Howard) was 35 feet away from him; he saw Lee Lee Ford, whom he knew from around the neighborhood, standing in front of a tavern on the corner; and he did not see Ford get into the Chevy but had told the police on August 20 that he saw someone else enter the car.

Also testifying for the State was Detective James Elliot. He stated that he interviewed four youths at the scene of the shooting and subsequently obtained arrest warrants for defendant, Rios, and Crockett. With respect to his interview with Michael Howard, Elliot stated that his police report contained "pretty much everything" Howard reported on August 20 about the August 19 shooting; Howard told him that he saw both Rios and defendant at the scene, but he did not say that Rios passed the gun to defendant and that he

would have included such information in his police report; Howard told him that Lee Lee Ford entered the car with defendant and Rios after the shooting; he did not think that Howard ever said that defendant drove the car; Howard never told him that defendant fired the gun; and Howard never told him he was walking slowly, looking behind him at the shooting.

Detective Terence Thedford and Assistant State's Attorney Michael Kelly testified concerning their custodial interrogation of defendant; defendant had surrendered himself to the police, accompanied by his mother, who had been contacted by the police that an arrest warrant had been issued for her son. Thedford testified that defendant admitted lying to the police in a previous interview, fearing gang retaliation; that, according to defendant's court-reported signed statement obtained by Assistant State's Attorney Kelly and defendant's oral statement to him, defendant, age 20, was at Mitch's Tavern at St. Louis and Ohio Streets on August 19 at 12:15 a.m. in the company of five fellow members of the Black Gangsters, including Crockett, Rios and Lee Lee Ford. As they were talking, they saw Ernest Jones, a Vice Lord, standing across the street talking to some girls. The group then began teasing Ford about not having ever retaliated against Jones, who had five months earlier struck him in the head with an iron, resulting in a five-day hospitalization and causing a scar. Someone then asked Ford if he wanted to shoot Jones, and Ford stated he would shoot him if he had a gun. Crockett produced a gun and gave it to another member of the group, who in turn gave it to Ford. Ford walked toward Jones, but returned, explaining that there were too many people around. Rios then volunteered to shoot Jones and Ford gave him the gun. When Jones began to walk west on Ohio, Rios told defendant to cross the street and stop him by asking for a cigarette. Defendant did so and, meanwhile, Rios went across the street and hid behind some bushes in an alley. As Jones walked by the alley, Rios came out from behind the bushes and fired toward Jones' head. Jones started running west and Rios fired again. After a third shot, Jones fell down. Defendant and Rios then ran to a gangway where they met the rest of their group and the gun was returned to Crockett. They then went home separately.

Dr. Yuksel Konacki also testified for the State. His autopsy of Jones revealed that he was a 19-year-old black male who died as a result of a gunshot wound in his back; he had been struck with only one bullet.

Following closing arguments, defendant's jury found him guilty of murder. Rios was acquitted by his jury. Defendant's post-trial motions

were denied. At defendant's sentencing hearing, the State argued that the only factors in aggravation consisted of the facts of the case. In mitigation, defendant's counsel pointed out that defendant had a history of mental problems; at age 13 he attempted to hang himself and was committed to a mental health center for one year where he was placed on daily medication, which he was also required to take after his release from the center. In addition, defendant had no prior felony convictions and no history of violent behavior. The court subsequently imposed a sentence of 24 years, and this appeal followed.

Defendant first argues that he was denied a fair trial as a result of the State's comments in closing rebuttal argument that Tyrone Carr was afraid to testify, which the trial court had previously specifically forbidden any reference to. The complained-of comments followed the State's argument to the jury that defendant was guilty of the murder of Ernest Jones on an accountability theory, *i.e.*:

> "Do we want a civilized society, a civilized city, *** a law-abiding one, to be governed and dictated by the laws of the court, or do we want the laws of Willie Mullen [defendant] and Manuel Rios to run the streets?
>
> Because, when you consider your verdict, a guilty or not guilty is a message; it is a message, not only to Manuel Rios and Willie Mullen, what they can do in a bad part of the city *where kids who are scared and frightened are going to have to come into court and testify.*
>
> *And, when you consider that, remember perhaps one of the most powerful things in this case was when Tyrone Carr got up on the stand the first time, and he said he did not want to answer.*
>
> *And use your common sense why he did not want to answer. The same reason that no one wanted to talk, at first; they do not want to get involved.*
>
> *Why don't they want to get involved? They do not want one of these (indicating) in their back. Is this going to be what runs the streets of the City of Chicago?"* (Emphasis added.)

The State contends that defendant waived this issue by failing to object during trial or raise the issue in a motion for a new trial or, alternatively, that the complained-of comments were properly based on the evidence. Additionally, it argues that if the comments were error, the error was harmless beyond a reasonable doubt in light of defendant's detailed confession.

In response to the State's waiver argument, defendant asserts that we may consider this issue under the plain error rule;

"[p]lain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court" (107 Ill. 2d R. 615(a)). We agree with defendant. While it is well settled that a prosecutor has great latitude in making closing argument to a jury (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847), statements that are so prejudicial that they in effect deny a defendant a fair trial may warrant a reversal of a conviction even where there is considerable evidence against the defendant (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880). Statements that a witness is reluctant to testify because of fear of retaliation or involvement where no evidence was presented that an accused had in fact threatened a witness have been held to be so prejudicial and inflammatory as to require a reversal. *People v. Thomas* (1986), 146 Ill. App. 3d 1087, 497 N.E.2d 803; *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.

■ In the instant case, there is absolutely no evidence that Carr's or the other two boys' fear of testifying was based on any threats by defendant. Clearly, the comments were error. We also reject the State's assertion that the error did not affect defendant's substantial rights and therefore was harmless beyond a reasonable doubt in light of defendant's detailed confession. We first observe, as defendant points out, that the three eyewitnesses' account of the murder was at variance with his confession. For example, *none of the eyewitnesses* saw *anyone* act as a set-up man for Rios and two of the three witnesses did not even place defendant at the scene. Howard, who did place defendant at the scene, was impeached based on discrepancies between his trial testimony and his previous statements to police officers in which he never told them defendant fired the gun. Additionally, Carr's and Lee's testimony and defendant's confession statement that Rios fired all three shots contradicted Howard's version that defendant fired the gun at the victim. We further observe that while the three witnesses testified that they saw the victim's assailants enter a getaway car, defendant stated in his confession that he and Rios ran to a gangway to join their group after the shooting and then went home separately, thus indicating there was no car at the scene.

Based on these numerous discrepancies between defendant's confession and the three eyewitnesses' testimony, without the complained-of comments by the State we believe the jury could have reasonably concluded that while defendant was present at the scene of the shooting, he in fact was not a participant in the murder, but merely stated he was in order to satisfy some need to feel important—an act of bragging by a young gang member—without realizing

he could be held accountable if he were believed to have participated as he so confessed. That this is a possibility is bolstered by the fact that defendant had no serious contact with the criminal justice system, he did not finish high school, and he had severe mental problems for which he was under medication. On the other hand, the jury could have believed that the discrepancies could be explained by the witnesses' fear of defendant and being shot in the back like the victim, as implied by the State's comments, and that but for their fear of defendant they would have testified that defendant participated in the murder as Rios' set-up man. Accordingly, we hold that the complained-of comments substantially prejudiced defendant (see *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200); they were not harmless beyond a reasonable doubt and constituted reversible error, requiring a new trial.

In light of our disposition of the foregoing issue, we find it unnecessary to address any other arguments raised by the parties.

Reversed and remanded.

PINCHAM and COCCIA, JJ., concur.