THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KENNETH SMALLWOOD *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—89—2235, 1—89—2432 cons.

Opinion filed December 30, 1991.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Winston & Strawn, both of Chicago (Timothy P. O'Connor, of counsel), for appellant Kenneth Smallwood.

Randolph N. Stone, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant Gregory Smallwood.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Robyn Berman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal. Defendants Kenneth and Gregory Smallwood (brothers) were charged by indictment with the murder of Larry Echols. Following a jury trial, the jury entered a verdict of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) as to each of the defendants. Kenneth and Gregory were each sentenced to prison terms of 35 years.

On appeal, Kenneth and Gregory each contend that: (1) he was not proved guilty beyond a reasonable doubt; (2) during closing argument, the prosecutor made prejudicial remarks which denied each of them a fair trial; and (3) he was prejudiced by the trial court's limitation of defense counsel's cross-examination of a State's eyewitness. Kenneth, individually, contends that: (4) he was prejudiced by the rebuttal testimony of Assistant State's Attorney Sherie Weisberg regarding his post-arrest statement; (5) the trial court erred in admitting the rebuttal testimony of Chicago police detective George Tracy because the prosecutor failed to lay a proper foundation for admission of a prior inconsistent statement; and (6) the cumulative effect of alleged trial errors deprived him of a fair trial. Gregory, individually, contends that: (7) the Illinois homicide act violates the due process, equal protection, and separation of powers clauses of the United States Constitution; and (8) the trial court erred in sentencing him to an extended prison term of 35 years.

The record sets forth the following facts relevant to this appeal. At trial, Chicago police officer Henry Harris testified on behalf of the State that on August 13, 1987, at approximately 3:30 p.m., he and his partner William Parker were flagged down by people who stated there was gunfire in the alley behind 57th and Wabash Streets. Harris found Larry Echols (hereinafter Larry or Echols) lying in a pool of blood, and nearby saw three spent nine-millimeter shells and one live

round of ammunition. Harris called for an ambulance and backup officers.

On cross-examination, Harris testified that his work involves gang-activity investigations and that some blocks close to 57th and Wabash are areas of high gang concentration. He acknowledged that some gang members tattoo their bodies, but did not notice any gang tattoos on Echols' body; he was concerned at the time with getting Echols into an ambulance. Harris did not know if the shooting was gang related. He was unable to recall whether Echols was wearing a jacket, but saw a leather jacket on a car parked next to Echols' body. He acknowledged that a six-pointed star tattoo can indicate membership in five or six different gangs in Chicago. He tried to talk to the large group of people in the area, but most of the people he talked to were reluctant to cooperate with the police and did not want to give him their names.

Dr. Edmond Donoghue, deputy chief medical examiner for Cook County, testified that he performed an autopsy on Echols on August 14, and that Echols suffered four gunshot wounds. Three of the wounds were to Echols' head; two wounds exhibited evidence of close-range firing. He noted the six-pointed star tattoo on Echols' body in his report because it provided "sociological" information. Donoghue also stated that he received trousers, socks, shoes and a white T-shirt along with Echols' body. He determined that Echols died of multiple gunshot wounds.

Next, Lonell Echols, brother of the deceased, testified that the defendants' father, Willie Smallwood, had been married to his sister, Della. Lonell stated that in July 1986, he was prosecuted on charges of first degree murder in the shooting death of Willie Smallwood, but found not guilty on grounds of self-defense.

Lonell testified that on August 13 at approximately 2 p.m. he and Larry were standing near 57th Street and Michigan Avenue talking to Larry's friend "Nate." At 2:30, Nate left, and he and Larry noticed Kenneth walking toward them. Immediately thereafter, Lonell saw Gregory driving a green and white Oldsmobile 98 toward them from 56th and Michigan. Lonell and Larry ran through the alley connecting 57th and 56th Streets, and Lonell called their sister Willie Mae from a pay phone. While Lonell was on the phone, defendants pulled up on the west side of the street. Kenneth got out of the car and shot twice over the car at Lonell and Larry, who ran in different directions. Lonell ran to 57th and Wabash, and Larry ran to Nate's house at 57th and Michigan.

Willie Mae picked up Lonell at 57th and Wabash and Larry at 57th and Michigan. Larry got out of the car at 57th and Wabash to speak to Joe Hunley, and Lonell last saw Larry speaking to Hunley at the mouth of an alley located there.

Lonell acknowledged that Larry was a gang member in jail in 1986, but stated that Larry was not in a gang at the time of his death in 1987. Lonell stated that Larry had two tattoos, one on his chest of his initials, and another on his left arm which said "I Love Mom." When Lonell was shown an autopsy photo of Larry, he acknowledged the presence of a six-pointed star tattoo, but maintained that he had never seen the tattoo on Larry.

On cross-examination, Lonell testified that a six-pointed star signifies membership in the "Disciples" street gang. He stated that there were no bad feelings between his family and the Smallwood family, but that he had no social contact with the Smallwoods since Willie Smallwood's death. He stated that he never called the police on the day of Larry's death, because his sister did not have a telephone, and that he returned with a cousin to the area in the early evening of the next day.

Willie Mae Echols testified to the same facts as Lonell regarding his phone call to her for a ride. She testified that later that day, she received a second call from Lonell, after which she called the police. The police later came to her house and told her that she had to identify the body of her brother Larry, which she did on the next day. On cross-examination, she testified that she had always had a telephone in her apartment and that Lonell knew that she had a phone. She stated that no one called the police when she arrived at her home with Lonell and Larry.

Next, Joe Hunley testified on behalf of the State. Hunley testified that at 2:30 p.m. on August 13, he was standing in the alley of 57th Street between State and Wabash with a guy named "Ray" and Larry Echols. Larry went to a nearby garage to light a cigarette, and while he walked back toward Hunley, two men pulled up in a blue Gremlin automobile with white stripes. At the time, Hunley was six feet from Larry. Both men got out of the car and started shooting at Larry, who ran from them. Both men, whom Hunley identified in court as defendants, ran past him and after Larry. Hunley ran to a nearby store and remained there until the car pulled away. When he returned, Larry lay dead in the alley. Later that evening, Hunley identified defendants in a photo lineup at the police station.

On cross-examination, Hunley testified that he did not know defendants and had never seen them before August 13, 1987. He was

aware that Larry had a six-pointed star on his arm, and that the tattoo was a symbol of the Disciples street gang. Hunley acknowledged the presence of a Disciples tattoo on his own arm similar to the tattoo on Larry's arm, but stated that his membership in the gang ended over 10 years prior to the trial.

Next, LaShune Williams testified that on August 13, at approximately 3:30 p.m., she was in the alley on 57th Street between Wabash and State, having a beer with some friends, when she was approached by Larry Echols, who asked for a light. She did not know Larry at that time. She did not have a light, and Larry walked on toward the other end of the alley at 58th Street. Shortly thereafter, she saw Larry running from defendants, who were armed with guns. Defendants stopped near her for a minute and fired their guns at Larry as he ran from them. After a few shots were fired, the defendants walked up to Larry, and she did not see Larry standing. She noticed that one of the defendants was taller than the other and had fuller hair. The taller defendant told the other to "give him three to the head," but the other defendant's gun jammed. The taller defendant then shot his gun three times at Larry, and they both ran away. On the evening of the next day, Williams identified defendants in a police photographic lineup. She also identified defendants in open court. Initially, Williams could not see defendants in court to identify them, but when she stood up, she could see clearly and identified defendants immediately. Williams stated that she is 5 feet 3 inches tall. On cross-examination, Williams testified that her view of the incident was clear from where she was sitting.

Chicago police detective George Tracy then testified that on August 13, he investigated the crime scene and interviewed six or seven witnesses, including Hunley and Williams. Tracy saw three spent bullets and one live round at the scene. Tracy testified that based on his experience as a police officer, and as a former owner of a nine-millimeter automatic pistol, when the weapon jams, the "slide" must be pulled back in order to eject the live round that did not fire. Tracy and other officers undertook extensive efforts to locate the defendants. On October 6, 1988, Tracy and Detective George Holmes brought Kenneth back to Chicago from Las Vegas, Nevada.

Chicago police officers Michael Carrol and John Robertson testified that they were present during the photo identification of defendants. They each stated that Williams and Hunley identified defendants from the photos and that neither Williams nor Hunley looked at the backs of the pictures before choosing defendants' photos. Robertson testified that he and a Markham, Illinois, detective brought Gregory

back to Chicago from San Bernadino, California, on February 16, 1988.

Della Tucker, the sister of Larry and Lonell Echols, then testified that she had been married to Willie Smallwood, the father of her child. Tucker testified that on the Saturday prior to the murder, August 8, 1987, she and Larry were leaving the Bud Billiken Day parade when they were approached by defendants in a green and white Oldsmobile 98. Kenneth got out of the car and asked them if they knew where Lonell was, to which Della and Larry replied they did not. Kenneth told Larry that if he found Lonell, he was going to kill him. He also threatened to kill Larry as well if he saw Larry with Lonell.

At the close of the State's evidence, defendants' motions for directed verdict were denied. As alibi testimony for defendants, defendants' sisters Jacqueline Smallwood and Carolyn McClure, and their boyfriends, Jimmy Ward and David Irving, testified. Each defense witness testified that they attended a birthday party for Ward at McClure's house on August 13, and that Irving left at 2:45 p.m. to go to work, but that both defendants never left the house until nearly midnight. Each defense witness knew that the party was sometime in August, but could not recall the exact date. McClure, upon seeing Ward's driver's license, testified that since Ward's birthday is August 12, the party occurred on the following day. Jacqueline Smallwood testified that defendants were playing cards with Ward at the party. Irving stated that Jacqueline and McClure were also playing cards with them. Ward stated that he had been with McClure off and on for 14 years. He also claimed that he had only been to her apartment twice, despite the fact that his son lived there. McClure stated that she never spoke to the police about this case after her brothers' arrest.

Kenneth Smallwood then testified on his own behalf. Kenneth admitted that he spoke to Larry and Tucker several days before the murder. He admitted telling Larry that he and Lonell had better stay away from him. About 15 minutes later, Kenneth approached Lonell and three or four of his friends and asked Lonell why he killed his father. Kenneth stated that he left Chicago and went to Nevada after Larry was killed because he was afraid the police thought he had something to do with Larry's death. Kenneth could not recall where he was on August 13, 1987. At the time he talked to the police and the State's Attorney, he told them that on August 13, he was at Jacqueline's house working outside on her car.

On cross-examination, Kenneth testified that he never drove an Oldsmobile 98, and that his family car was a green Buick. He stated that he had been afraid of Lonell ever since Lonell had killed his fa-

ther. He denied telling Assistant State's Attorney Sherie Weisberg that he couldn't have shot Larry because when he shoots someone he doesn't miss. He admitted that he told Weisberg a number of different stories following his arrest, but said that he did that just to get her out of the room. He admitted that he had been convicted of two felonies, in 1979 and 1985.

Gregory Smallwood then testified on his own behalf to the same essential facts as Kenneth. Gregory stated that although he had bad feelings for Lonell, he did not shoot at him or Larry. He knew that the police were looking for him after Larry's murder, so he left Chicago one week later for California.

The State then offered two witnesses in rebuttal. Assistant State's Attorney Sherie Weisberg testified that she spoke with Kenneth on October 7, 1988, at approximately 1:20 a.m. Kenneth denied any involvement in Larry's murder. Weisberg told him that he had been seen shooting at Larry and Lonell earlier on August 13, although he had missed his target. Kenneth replied, "[I]t couldn't have been me because when I shoot I don't miss." Weisberg left the interview room to transcribe Kenneth's story when she heard him pounding on the wall. She reentered the room with Tracy. Kenneth told her he wanted to tell her where he was on August 13.

Detective Tracy testified that on October 18, 1988, he was working on an aggravated assault case where Carolyn McClure, defendants' sister, was the victim. McClure spoke to Tracy about Larry's murder and confirmed what Kenneth had already told him, that on August 13, 1987, he was working on a car until approximately 2:30 p.m. Kenneth did not see McClure because she was upstairs in another apartment.

Following closing arguments and deliberations, the jury found both defendants guilty of the murder of Larry Echols. A hearing in aggravation and mitigation was then held, after which the trial court sentenced each defendant to prison terms of 35 years. This timely appeal followed.

Initially, both Kenneth and Gregory contend that the State failed to prove them guilty of murder beyond a reasonable doubt. Defendants argue that the testimony of State's eyewitnesses Joe Hunley and LaShune Williams was not credible and that their identification of defendants was unreliable. Defendants further argue that they presented strong alibi testimony and established a credible possibility that the shooting might have been the result of gang violence.

It is within the province of the trier of fact to determine the credibility of witnesses and the weight to be accorded their testimony. On

review, mere conflicting evidence does not constitute sufficient grounds for reversal, and a reviewing court will not disturb a verdict of guilty unless the evidence is so improbable that it raises a reasonable doubt as to guilt. *People v. Rader* (1988), 178 Ill. App. 3d 453, 532 N.E.2d 1365.

Gregory argues that Hunley's testimony should be viewed with skepticism because Hunley was a member of the Disciples street gang, and that Williams' in-court identification was shaky and improperly bolstered by the judge. Gregory relies on *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, and *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, as support for the general proposition that where the evidence is insufficient to prove guilt, defendants' convictions must be reversed outright. In our view, Gregory's argument is insufficient to demonstrate that the evidence was so improbable as to raise a reasonable doubt as to his guilt.

Kenneth contends that the identification of the assailants by Hunley and Williams was vague and doubtful under the factors set forth in *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317. There, the court looked to the following in assessing an identification of defendants:

> (1) The opportunity the victim had to view the criminal at the time of the crime;
>
> (2) the witness' degree of attention;
>
> (3) the accuracy of the witness' prior description of the criminal;
>
> (4) the level of certainty demonstrated by the victim at the identification confrontation; and
>
> (5) the length of time between the crime and the identification confrontation.

Kenneth argues that Hunley had a bad vantage point and was unnerved and agitated by the shooting, that he did not call the police and that he failed to write down the license plate number of the assailants' car. Thus, Kenneth argues, Hunley did not have the presence of mind to pay attention to the events. Kenneth further argues that Hunley did not demonstrate certainty in his identification of defendants because at trial, he admitted that his general recollection of the events of two years ago was incomplete, *i.e.*, he could not recall what day upon which August 13, 1987, fell, or which defendant began shooting first.

Kenneth argues that Williams was at a poor vantage point to view the events and that her view was constrained to a gap between two cars, that she tried to escape from the area and that she was not

looking at the events in the alley. Kenneth contends that because Williams could not initially see defendants in court when asked to identify them, her identification was uncertain:

"Q. Now, the two persons that you saw run past you while you were in the alley, stop and then fire, do you see them in court today?

A. No.

Q. Why don't you stand up, LaShune. Look around the courtroom again and see if you see them in court today?

A. Yes.

Q. Where are they?

A. Right there."

▮ The State responds that there is no evidence that Hunley's and Williams' identification of defendants was vague and uncertain. Both witnesses testified that they saw defendants at the scene and that they did not know either defendant prior to the incident. Williams specifically testified that her view of the defendants was unobstructed, even though there were cars in the area. Each witness chose defendants' pictures from a photo lineup the day after the shooting without hesitation. In addition, each witness identified defendants in open court.

Further, the eyewitness testimony was corroborated by other witness testimony. Williams testified that she saw defendants shoot Echols three times in the head. Donoghue, the medical examiner, testified that three of the four gunshot wounds to Echols were to his head. Williams also saw defendant's gun fail to fire. Tracy testified that he found a live round of ammunition at the scene, evidence of a gun that failed to fire.

Also, although defendants presented alibi testimony, there is no obligation on a trial court to believe alibi testimony over positive identification of the accused, even though the alibi testimony may be given by a greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 586, 177 N.E.2d 168.) Accordingly, we do not find the evidence presented against defendants so improbable as to raise a reasonable doubt as to the guilt of either defendant.

Next, defendants each contend that comments made by the assistant State's Attorney during closing argument prejudiced them and thereby denied them a fair trial. Defendants argue that the prosecutor's comments were not based on any evidence offered at trial. Defendants object to the following comments made by the prosecutor during closing argument:

"The police had to come in and find Mr. Hunley. And he had the courage to come in here and testify when others who were there would not and did not. And you can—your common sense can also tell you, ladies and gentlemen, why those other persons did not want to come—."

Defense counsel objected and the court sustained the objection and instructed the jury to disregard the statement. Defendants argue that the trial record does not show that either defendant ever threatened any potential witnesses, and thus, the comment is prejudicial.

It is well recognized that great latitude is afforded a prosecutor during closing argument and that the determination as to the propriety of the comments is within the trial court's discretion and will not be reversed on appeal absent a showing of abuse of discretion or substantial prejudice to defendant. (*People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487.) In closing argument, the prosecutor has the right to comment on the evidence that has been adduced at trial and make all reasonable inferences drawn from that evidence. *People v. Rader* (1988), 178 Ill. App. 3d 453, 532 N.E.2d 1365.

The State responds that the prosecutor properly based his argument on evidence adduced at trial, brought forth by defense counsel. The State argues that the prosecutor's comments relate directly to Officer Harris' testimony. Harris testified that he was flagged down by people who stated that there was shooting in the alley. He found Larry Echols' body lying in a pool of blood and called for assistance. Harris gave the following testimony on cross-examination:

"Q. And there were some other people in the alley that you tried to talk to figure out what happened, is that right?

A. Yes.

Q. And at that point, you didn't know who it was whose body you found on the ground? You didn't know it was Larry Echols, did you?

A. That's correct.

Q. You didn't know if this was gang related or not, did you?

A. No, I did not.

Q. As a matter of fact, you didn't know who shot him or why they shot him, did you?

A. No, not when I initially arrived.

Q. You had no idea if it was self-defense or contract murder?

[MS. QUATTROCCHI]: Objection to this.

THE COURT: Sustained.

[MR. LINN]: Very well.

Q. You did find, however, that there was a large group of people around there, correct?

A. Yes.

Q. You tried to talk to these people to find out some information about what happened, is that correct?

A. That's correct.

Q. It's fair to say that most of the people that you talked to didn't want to cooperate with you at all, did they?

A. Yes.

Q. Most of the people didn't even want to give you their names, is that correct?

A. That's correct.

Q. Okay. Now, did you try to spend some time convincing these people that they—that you needed their help, they should get involved by giving you their names so you could talk to them later maybe away from the scene where they wouldn't be seen talking to the police? Did you make any efforts to do things like that?

A. Yes.

Q. But you wrote down in your report that most of them— these people refused to get involved, refused to talk to you?

A. That's correct.

Q. The people that had originally volunteered to help you out with your investigation, were they anywhere around the alley by the time you got there?

A. No.

Q. Did you ever see them again?

A. No."

Defendants' reliance on *People v. Mullen* (1989), 184 Ill. App. 3d 539, 540 N.E.2d 473, is unpersuasive, as *Mullen* is factually distinguishable from the present case. There, a witness was offering testimony, when he abruptly stopped and refused to testify any further. The witness told the court, in closed chambers, that he was afraid to testify any further. When the witness agreed to testify the next day, the court instructed counsel not to ask the witness any questions or make any reference to his reluctance to testify, or a mistrial would be granted. (*Mullen*, 184 Ill. App. 3d at 540.) During closing rebuttal argument, the prosecutor violated the trial court's order and told the jury to *"use* [their] *common sense"* as to why the witness refused to testify during the trial. (Emphasis in original.) (184 Ill. App. 3d at 543.) He further told the jury that the witness did not want a dagger in his back. (*Mullen*, 184 Ill. App. 3d at 543.) The court reversed and

remanded the case for a new trial, stating that the comments were in error and there was no evidence that the witness' fear of testifying was based on any threats by the defendant.

█ In the present case, the record establishes that the comments were directly related to witness testimony, and not related to a witness refusing to testify. Even if the comments made by the prosecutor were improper, in light of the jury's verdict against both defendants and the trial court's instruction to the jury that it should disregard the comments, any possible error was harmless and does not provide grounds for reversal. (*People v. Sawczenko* (1989), 180 Ill. App. 3d 406, 535 N.E.2d 1105.) Further, any prejudice is cured by the court's instruction that closing arguments are not evidence in the case and any argument not based on the evidence should be disregarded. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590, 602, 539 N.E.2d 276.) For these reasons, the prosecutor's comments during closing argument do not provide grounds for reversal of defendants' convictions.

Next, Kenneth and Gregory each contend he was deprived of the right to have the jury evaluate the identification evidence. Defendants first argue that in sustaining the prosecutor's objection, the trial court improperly invaded the province of the jury by offering its opinion that Williams' identification testimony was positive and credible. During the cross-examination of LaShune Williams by defense counsel, Mr. Linn, the following occurred:

"Q. [by Mr. Linn:] Now, the next time, very next time that you saw these people in person was when?

A. I didn't see them in person.

Q. Well, today you stood up and you pointed to some people today, is that right?

A. Yes.

Q. And the people you pointed to looked like the guys that you saw in the alley, is that right?

A. Yes.

[MS. QUATTROCCHI]: Objection, judge.

THE COURT: Sustained.

MR. LINN: Judge, I think she can answer that question.

THE COURT: Well, I don't think I'm going to let her answer it, Mr. Linn. Because you're putting the words into her mouth. Let's make the statement clear. Okay. She identified two people in the courtroom. Now, go ahead and ask her a question."

█ In response, the State initially contends that the trial court properly sustained the prosecutor's objection, thereby precluding de-

fense counsel from examining Williams on a legal issue that had already been ruled upon. (*In re Interest of Lamb* (1974), 21 Ill. App. 3d 827, 837, 316 N.E.2d 42.) The record in this case indicates that both Williams and Hunley positively identified defendants in open court and, thus, identification of defendants was established to the satisfaction of the jury.

The State further argues that the prosecutor's objection was to the form of the question. It is well settled that matters such as the form of the question are within the discretion of the trial court and will not be reversed absent an abuse of that discretion. (*People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.) We find no error on this issue.

The remark by the court in the present case closely resembles the remark of the court in *Price*. There, the defense counsel asked the State's eyewitness on cross-examination: "The day of the incident, how long was the person that you believe to be Eugene standing near you?" The prosecutor objected and the trial judge sustained the objection, stating: "He has identified the defendant as being that person." On appeal, the court held that the trial judge's remark was a ruling sustaining the prosecutor's objections and the reasons therefor, and that the statement of the trial judge was not of such a nature to prejudice defendant in the eyes of the jury and result in reversible error. (*Price*, 76 Ill. App. 3d at 629.) Accordingly, we conclude that the remark of the trial judge in the present case did not indicate such prejudice.

In reliance on *People v. Eckert* (1990), 194 Ill. App. 3d 667, 551 N.E.2d 820, defendants finally contend that the remark of the trial judge demonstrated bias in favor of the State by suggesting that defense counsel was "engaging in trickery" and wasting the court's time. *Eckert* is distinguishable on the facts and therefore unpersuasive. In *Eckert*, the trial judge, in the presence of the jury, goaded the defense attorney ("You are trying to louse up the case, too"), refused to allow him to approach the bench, and threatened to stop listening to his argument ("Paul, I'm deaf and getting deafer"). Finally, the trial judge recessed the court, and when defense counsel told him he had a trial scheduled the next day the judge responded, "Look at poor Paul, he'll be in jail." (*Eckert*, 194 Ill. App. 3d at 673.) On appeal, the court held that the trial judge's remarks not only conveyed an impression to the jury that he felt defense counsel was not doing his job properly, but also that the defense was wasting the court's time. (194 Ill. App. 3d at 674.) We find no similarity between the remarks of the

trial judge in the present case and the ongoing, inciting commentary engaged in by the trial judge in *Eckert*.

Next, Kenneth, individually, contends that he was unfairly prejudiced by the rebuttal testimony of Assistant State's Attorney Sherie Weisberg and Chicago police detective George Tracy. Kenneth argues that the rebuttal testimony was improper because it contradicted prior defense testimony.

The decision to admit rebuttal testimony is within the sound discretion of the trial court, and its determination will not be reversed absent a showing of abuse of discretion. (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 398, 459 N.E.2d 1102.) Rebuttal testimony which serves to contradict a defense witness is proper if it reflects adversely upon the credibility of that witness. *People v. Green* (1975), 26 Ill. App. 3d 662, 669, 325 N.E.2d 316.

Weisberg testified that during her conversation with Kenneth, she told him that he had been seen shooting at Larry and Lonell Echols earlier on August 13, 1987, but when he missed, he fled. Weisberg testified that Kenneth responded that "it couldn't have been me because when I shoot, I don't miss." Kenneth previously testified that he had been working on his sister Jacqueline's car on that day. The record indicates that the statement contradicts Kenneth's own testimony, and its admission is therefore proper to attack his credibility.

Kenneth also urges that his alleged statement to Weisberg was not relevant and has virtually no probative value because it does not make any fact more or less likely. Relevant evidence is that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without such evidence. (*People v. Johnson* (1986), 114 Ill. 2d 170, 193, 499 N.E.2d 1355.) We agree with the State that Kenneth's statement was relevant to the crime charged because Echols was killed with a gun, and that the statement indicates Kenneth's familiarity with guns and expertise at using them.

We also agree with the State that Kenneth's statement was properly presented as his own admission. An admission is a statement of independent facts which, when taken in connection with proof of other facts, may lead to an inference of guilt of the crime charged, but from which guilt does not necessarily follow. (*People v. Houseton* (1986), 141 Ill. App. 3d 987, 993-94, 490 N.E.2d 1354.) Any and every statement by an accused person, so far as not excluded by the doctrine of confessions, or by the privilege against self-incrimination, is usable against him as an admission. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 470, 368 N.E.2d 689.) The statement is Kenneth's own

admission, admissible to infer his guilt. *Howell*, 53 Ill. App. 3d 465, 368 N.E.2d 689.

Kenneth further contends that he was unfairly prejudiced by the rebuttal testimony of Detective Tracy because it contradicted Mc-Clure's statements in corroboration of defendants' alibi defense. Kenneth's sister, Carolyn McClure, testified on defendants' behalf, that on August 13, 1987, both Kenneth and Gregory were with her at a birthday party that lasted from the early afternoon until late into the evening. On cross-examination, McClure denied ever speaking to the police about this case prior to trial. Thereafter, the State recalled Detective Tracy on rebuttal who testified that McClure had in fact spoken to him prior to trial. Tracy testified that on October 18, 1988, he was working on a case where McClure was an aggravated assault victim. He stated that he spoke to McClure about the Echols murder case, but the trial judge would not allow the State to ask further about the content of the conversation.

During Tracy's cross-examination, Tracy testified that he did not record in writing his conversation with McClure. Out of the presence of the jury, the State asked Tracy why he did not transcribe their conversation and he answered "because it was a very short conversation and she only corroborated what Kenneth Smallwood told me two weeks prior." Tracy then testified as to what Kenneth had told him, that on the day of the murder, he had been working on a car.

Kenneth contends that the State failed to lay a proper foundation to impeach McClure with a prior inconsistent statement in reliance on *People v. Galindo* (1981), 95 Ill. App. 3d 927, 420 N.E.2d 773. There, the court held that before a witness may be impeached by a prior inconsistent statement, a proper foundation must be established by directing the attention of the witness to the time, place, and circumstances of the *statement*, as well as to the *substance of the statement*. (95 Ill. App. 3d at 934.) Kenneth argues that the State failed to lay the proper foundation to impeach McClure's statement that defendants were at her house at a party on the day of the murder.

■ However, the State responds that rebuttal evidence is that which is adduced by the prosecution to explain, repel, contradict, or disprove evidence presented by the accused. (*People v. Rios* (1986), 145 Ill. App. 3d 571, 584, 495 N.E.2d 1103.) The State argues that Tracy's rebuttal testimony did not impeach McClure as to the substance of her alibi testimony, but merely refuted that she had spoken to the police. We agree. The record indicates that the trial judge refused to allow the State to question Tracy regarding the content of McClure's conversation, and Tracy only testified as to what Kenneth

told him. We find the error, if any, harmless since Kenneth had testified as to the content of the statement earlier in the trial.

■ Finally, Kenneth contends that even if none of the above alleged errors individually warrants reversal of the judgment, he is nevertheless entitled to relief because the cumulative effect of the errors deprived him of a fair trial. This argument is without merit as "[t]he whole can be no greater than the sum of its parts" (*People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206), and where there is no reversible error on any individual issue, these errors cannot cumulatively warrant a new trial. 102 Ill. 2d at 83-84.

Next, Gregory, individually, contends that the Illinois homicide statute (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1, 9—2) is unconstitutional because it violates the due process, equal protection, and separation of powers clauses of the United States and Illinois constitutions. This court recently addressed this issue in great detail in *People v. Wright* (1991), 218 Ill. App. 3d 764, 578 N.E.2d 1090, and *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215, and rejected the same argument. Thus, a lengthy discussion of defendant's arguments is not necessary.

Defendant first argues that the statute shifts the burden of proof to defendant to prove mitigating factors in order to avoid a conviction of first degree murder, and that such a burden on defendant violates due process. Under the statute, a defendant is guilty of second degree murder when he commits first degree murder but is able to prove by a preponderance of the evidence the presence of a valid mitigating factor. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2.) The statute provides in relevant part:

> "(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors *** has been presented, *** the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing [as self-defense]." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c).

■ Due process requires that the prosecution prove every element of an offense beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) It is a denial of due process to shift the burden of proving an element of an offense to a defendant. (*Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881.) However, a defendant is not denied due process when he is required to prove a mitigating factor, which is an affirma-

tive defense rather than an element of the offense, to reduce his murder charge to a lesser charge. (*Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319.) Sections 9—1 and 9—2 of the Criminal Code do not violate the due process clause by requiring defendant to prove a mitigating factor to reduce a first degree murder charge to second degree murder. *People v. Davis* (1991), 221 Ill. App. 3d 1023, 1026-27; *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041; *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373; *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.

Defendant next argues that the statute violated equal protection because under the statute, defendants encounter obstacles that defendants charged with other crimes do not. The equal protection clause requires that the State treat similarly situated groups of persons equally, but it does not require equal treatment for groups that are dissimilar. (*People v. Willis*, 217 Ill. App. 3d at 928.) Defendants charged with first degree murder are not similarly situated with defendants charged with other offenses. (217 Ill. App. 3d at 928.) The statutory scheme is rationally designed to meet a legitimate State purpose, and thus, does not violate equal protection. *Gore*, 212 Ill. App. 3d at 996.

Finally, defendant contends that the statute violates the separation of powers provisions of the Federal and State constitutions by requiring the prosecution to always initially charge defendants with first degree murder, thereby revoking the power of the State's Attorney to choose to charge a defendant with a lesser crime. Under the separation of powers clause, the legislative, executive, and judicial branches of the government are separate and no branch may exercise powers belonging to another branch. (Ill. Const. 1970, art. II, §1.) A party has standing to challenge the constitutional validity of a statute only if he has sustained or is in immediate danger of having sustained some direct injury as a result of enforcement of the statute. (*People v. Willis*, 217 Ill. App. 3d at 928.) To establish standing, defendant must show that the State was barred from charging him with second degree murder. (217 Ill. App. 3d at 928.) Defendant does not have standing to raise this argument because the State did not attempt to charge him with second degree murder, and even if he does have standing, the statute does not prevent the State from charging a defendant with second degree murder. *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373 (the State has the discretion to charge a defendant with second degree murder pursuant to section 9—2).

Lastly, Gregory contends that 35 years is an excessive sentence and should be reduced in light of his potential for rehabilitation. The trial court is the proper forum in which a sentence is to be determined, and the trial judge's decision regarding sentencing is given great weight and deference. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884; *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) It is well established that the imposition of a sentence is a matter of judicial discretion and that absent an abuse of that discretion, the sentence as determined by the trial court should stand. *Perruquet,* 68 Ill. 2d at 153.

In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet,* 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) A reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

The record in this case indicates that defendant was sentenced to a 35-year extended term of imprisonment, which is well within the statutory guidelines for first degree murder. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1) (first degree murder is punishable with a term of not less than 20 years and not more than 60 years).) The record indicates that the court considered that Gregory was previously convicted of voluntary manslaughter as a juvenile, that he had a close relationship with his family and that the motive was revenge for his father's death. The court also considered that defendant had sought counseling, and that he was a follower and not the actual planner of Echols' murder. The trial court found that in light of the jury's verdict against him for the taking of a life, along with his background, and the factors mentioned, a sentence of 35 years was appropriate.

Accordingly, Gregory has failed to show that the trial court erred in sentencing him to an extended term of 35 years.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.