2022 IL App (1st) 182305-U

SIXTH DIVISION
March 25, 2022

No. 1-18-2305

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 CR 18655 |
| | ) | |
| MIGUEL WEBSTER, | ) | The Honorable |
| | ) | Michele Pitman, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE MIKVA delivered the judgment of the court.
Justice Oden Johnson concurred in the judgment.
Presiding Justice Pierce concurred in part and dissented in part.

**ORDER**

¶ 1     *Held*:   Defendant's conviction for first degree murder will not be reduced to second degree murder where a rational juror could find that defendant did not believe he was acting in self-defense. Defendant has also failed to raise a valid eighth-amendment challenge to his 40-year sentence, which is not a *de facto* life sentence. We remand for resentencing, however, to allow the trial court to reconsider this sentence in light our supreme court's guidance in *People v. Buffer*, 2019 IL 122327.

¶ 2     Defendant Miguel Webster was convicted of first degree murder and sentenced to 40 years of imprisonment. Miguel now appeals. For the reasons that follow, we affirm the jury's finding of guilt on the charge of first degree murder but vacate the sentence imposed and remand for

resentencing.

¶ 3                                    I. BACKGROUND

¶ 4      The evidence at trial is summarized as follows.

¶ 5      Officer Barbara Klingelschmitt, a police officer with the Lansing Police Department, responded to a call to check on a person in an alley on September 12, 2012. Officer Klingelschmitt observed a person in a black hoodie lying face down in the grass. Once the hood was pulled back, Officer Klingelschmitt observed an indented wound on the left side of the person's head. Noting that the person was dead, she began securing the scene and canvassing the area. Officer Klingelschmitt followed a trail of blood to a nearby garage. She saw bloody drag marks and footprints around the garage as well as a blood-like mark on the handle of the service door to the garage. The door was unlocked, and Officer Klingelschmitt entered the garage and noted that the air smelled strongly of bleach.

¶ 6      Heather Poerio, a crime scene investigator with the Illinois State Police, processed the scene at the garage. Ms. Poerio testified that she also noticed a strong smell of bleach when entering the garage and blood stains on various objects in the garage, the walls, and the inside of the door. Ms. Poerio photographed the crime scene evidence and took swabs of the blood stains.

¶ 7      Officer Patrick Phillips, a crime scene investigator with the Illinois State Police, testified that he likewise observed blood-like stains on and around the service door to the garage. The blood stains on the ground formed a trail from the garage door to the alley. Officer Phillips believed these stains to be drag marks. Next to the garage was a trash can with a pool of blood below it and a bag filled with bloodstained clothing and other items. Officer Phillips recovered more bloodstained clothing from inside another trash can six feet from where the body was found. He then went to the residence in front of the garage and observed more blood stains on the handle of the screen

door. Inside the residence, there were more blood stains on the walls, floor, and light switch. Inside a bedroom closet, Officer Phillips found numerous bloodstained items, including cleaning spray, boots, and money. He also found two live shotgun shell rounds and two spent shotgun shell rounds. Underneath the box spring of the bed, Officer Phillips found a sawed-off shotgun.

¶ 8    Doctor Ponni Arunkumar, the chief medical examiner in the Cook County Medical Examiner's Office and an expert in the field of forensic pathology, reviewed the previous medical examiner's autopsy of the victim. The victim had shotgun wounds to the hand, lower face, and upper face. The wounds to the hand and lower face were consistent with defensive wounds an individual would receive by reaching out for a weapon. The pattern of both facial wounds indicated that the shotgun was fired from a distance of two to three feet. The victim had a blunt-force injury to his right eyebrow area, which was consistent with falling forward after being shot or with being struck by an object such as a weapon. The victim's torso had sustained injuries from being dragged. The manner of the victim's death was homicide.

¶ 9    A stipulation was entered that gunshot residue samples taken from the back of Miguel's right and left hands did not detect residue, meaning that he either did not fire a weapon, removed residue from his hands after firing a weapon, or the weapon did not deposit residue.

¶ 10    Detective Tony Curtis responded to the scene. After observing the nearby victim and the bloodstained garage, Detective Curtis knocked on the front door of the home. Miguel and his mother answered the door and were asked to go to the Lansing Police Department. Detective Curtis and his partner, Detective Mark Akiyama, interviewed Miguel at the police station. The interview was recorded, and portions of that recording, excluding certain redactions, were published to the jury.

¶ 11    Miguel also gave the following testimony at trial. He was 17 years old on September 12,

3

2012. He had known the victim, Asonte Gutierrez, from school since he was in eighth grade and Asonte was in seventh grade. He and Asonte had had a fight and subsequent falling out after Miguel "talked smack" while the two were playing basketball at a park. The verbal fight continued on Facebook, where Asonte told Miguel he would "smoke [his] ass," which Miguel took to mean he would be shot. The two later reconciled over the telephone, but Miguel told Asonte that he wanted to stay away from him because Asonte was "tweaking," meaning "one minute [he was] cool, the next minute [he was] not."

¶ 12    Two weeks later, in July 2012, around midnight, Asonte called Miguel and came to his house. Miguel met Asonte outside and the two called a truce. Asonte then showed Miguel a double-barreled shotgun in the trunk of his car, asked Miguel to hold onto it for him, and gave Miguel the gun and four or five bullets in a bag. Miguel put the gun under his box spring.

¶ 13    Around 7:00 or 7:30 p.m. on September 11, 2012, Asonte called Miguel and asked if he could come over to Miguel's house. Miguel agreed but Asonte did not come at that time. He called again around 9:00 or 9:30 p.m. and said he had "cuffed a bike" and was on his way over. At that point, Miguel told Asante not to come because Miguel had to be up early for school and Miguel's mother would not let Asante come over that late. Asonte contacted Miguel a third time, through Facebook, and asked Miguel to call him. Miguel responded, "Boy, I'm asleep." Asonte came anyway, between 10:00 and 10:30 p.m., and knocked on Miguel's bedroom window. Asante told Miguel to "check it out *** check it out, come outside to the garage" and told Miguel to bring the gun that Miguel was holding for him. Miguel did as he was asked, brought the gun to the garage, and gave it back to Asonte, thinking Asante would then leave. Asonte asked if the gun was loaded, and Miguel told him that it was. Asonte then pointed the gun at Miguel's face. Miguel asked Asonte what he was doing and pushed the gun away, but Asonte again pointed it at him and this

4

time pulled one of the hammers back. Miguel grabbed the gun and pointed it up in the air. He shoved the gun toward Asonte, hitting him with it. Asonte then called Miguel a "bitch," Miguel took the gun out of Asonte's hands, and Asonte put one hand up to protect himself. Miguel said that his "judgment was rushed," he was "scared" and he "just reacted," pulling the second hammer back on the gun and shooting Asonte. Miguel then took a step forward and shot Asonte a second time. Miguel clarified that both shots were fired around the same time. When he had previously told the police that five seconds passed in between the two shots, he had not actually been sure of how much time had passed; that was just his way of saying it happened very quickly. Asonte did not touch Miguel, move toward Miguel, or threaten Miguel in any way except by pointing the gun at him. Miguel maintained, however, that he thought Asonte was going to shoot him when he pointed the gun in his face.

¶ 14    Miguel immediately knew that Asonte was dead and went to hide the gun back under his box spring. He then dragged Asonte's body down towards a neighbor's house. Miguel unsuccessfully tried to clean up the blood in the garage with a blanket, a comforter, and a bucket of water.

¶ 15    Miguel first told police that he had not been in the garage that night, but that was not true. He also told police that Asonte had brought the gun with him that night, but that was also not true. Although in his interview Miguel agreed with the police when they suggested that he "moved in for the kill" and "just finished [Asonte] off," at trial he insisted he did not mean that. The officer questioning him seemed like "a nice guy" and Miguel was under the impression that the officer understood that Miguel had been acting in self-defense.

¶ 16    In addition to first degree murder, the jury was instructed on second degree murder and self-defense. After deliberation, Miguel was found guilty of first degree murder and the jury also

found that he personally discharged the firearm that caused Asonte's death. The trial court denied Miguel's motion for a new trial.

¶ 17    At sentencing, the trial court considered the presentence investigation report and testimony from several witnesses. The State presented evidence of Miguel's participation in a fight while in jail—one that involved 15 other individuals—and a victim impact statement from Asonte's mother. In mitigation, the court heard from Miguel and his mother that, at the time of this crime, Miguel had been going to school and working part time with his mother at South Shore Hospital. Miguel also expressed deep regret at having killed his friend and for the loss to Asonte's family.

¶ 18    The sentencing judge stated that, in aggravation, she had considered the seriousness of the offense and the fact the jury found that Miguel was not acting in self-defense. She recognized, however, that his crime had resulted, at least in part, from "a lack of maturity." She noted that she had "watched [Miguel] grow" over the six years she had presided over the case and pointed out that he "was doing things with his life," had "never been in trouble before," did not "come to court with any history, juvenile history, nothing," and had had family there to support him at "each and every court date."

¶ 19    The judge ultimately sentenced Miguel to 40 years of imprisonment, electing not to impose the 25-year gun enhancement for discharging a firearm that caused death or great bodily injury. She noted that since Miguel would be released at the age of 57, he would be "young enough to be rehabilitated and go on with his life after this tragic incident."

¶ 20    The court denied Miguel's motion to reconsider his sentence.

¶ 21    This appeal follows.

¶ 22                                II. JURISDICTION

¶ 23    The trial court sentenced Miguel on October 18, 2018, and Miguel timely filed his notice

of appeal on October 24, 2018. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 24                                III. ANALYSIS

¶ 25    On appeal, Miguel argues that his conviction should be reduced from first to second degree murder because he had a subjective, though unreasonable, fear for his life when he shot Asonte. Miguel also argues that his sentence is unconstitutional under *People v. Buffer*, 2019 IL 122327, or, in the alternative, that this case should be remanded for reconsideration in light of *Buffer*.

¶ 26      A. Miguel's Conviction for First Degree Murder Is Supported by the Evidence

¶ 27    Second degree murder is a "lesser mitigated" (emphasis omitted) offense of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995). "The imperfect self-defense form of second degree murder occurs when, "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of [the Criminal Code of 2012], but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2018). Self-defense is one such justification and exists where "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Jeffries*, 164 Ill. 2d at 128. Once the State has established the elements of first degree murder, it is the defendant's burden to prove by a preponderance of the evidence, not that these circumstances were in fact present, but that he or she believed them to be, and that the offense should thus be reduced to second degree murder. *Id*. § 5/9-2(a)(2), (c) (West 2018).

¶ 28 *"The question of whether a defendant's actions were committed under mitigating circumstances—here, the question of whether defendant unreasonably believed that circumstances justifying the use of lethal force were present—presents a question of fact." People v. Romero*, 387 Ill. App. 3d 954, 967-968 (2008). "The finder of fact has the responsibility to determine the credibility and weight of witness testimony, to resolve conflicts and inconsistencies present therein, and to draw reasonable inferences from the evidence." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52. On review, this court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 29 On this record, a rational trier of fact could have found that Miguel failed to show by a preponderance of the evidence that he actually and subjectively believed shooting Asonte was necessary to prevent harm to himself. Miguel's testimony regarding his subjective belief of danger was contradictory. Although Miguel stated at trial that he was "scared," he told police that he was "scared and angry" and "blacked out." Miguel also testified that Asonte called him a "bitch," which he said that he did not take lightly. Although Miguel testified at trial that he shot Asonte twice in quick succession, he initially told police that several seconds passed between the first and second shots. And while he later repudiated the statement at trial, he initially agreed with the police that he moved in and "just finished" Asonte with the second shot. Also, Miguel told the police when questioned after his arrest that, even after he gained control of the gun, he was still afraid that Asonte might have another weapon, but he made no mention of this at trial. These contradictions could have left a reasonable juror unconvinced that Miguel acted because he believed that shooting Asonte was necessary to prevent harm to himself.

¶ 30 A rational juror was also entitled to consider the evidence that Miguel hid the murder

weapon under his bed, attempted to clean the crime scene and dispose of bloody clothing, and dragged Asonte's body into a neighbor's yard, away from where the shooting took place. Miguel also initially denied being in the garage to police and later said that Asonte had brought the gun that night. These false exculpatory statements made to the police offer some additional support for the jury's conclusion that Miguel was guilty of first degree murder. A rational juror could have inferred from this evidence that Miguel did not in fact shoot Asonte because he believed that his actions were necessary for self-defense. See *People v. Seiber*, 76 Ill. App. 3d 9, 14 (1979) (noting that the jury "could have considered the defendant's flight from the scene and discarding of the pistol, as well as his attempt to give the pistol away, as evidence of his consciousness of guilt and thereby reject[ed] [his] theory of self defense"); *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 (noting that "[t]he fact that [the] defendant disposed of the weapon also indicate[d] a guilty state of mind and knowledge that he did not merely act in self-defense, even under an unreasonable belief in self-defense.").

¶ 31    In sum, a rational juror could have found that his inconsistent explanations as to what he was thinking and feeling at the time of the shooting and his actions after the shooting made his claim of self-defense, even imperfect self-defense, not credible. This court will not substitute its judgment for that of the fact-finder on questions involving the credibility of witnesses. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 32    "[T]he power to reduce a conviction of first degree murder to second degree murder should be cautiously exercised." *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). Viewing the evidence in the light most favorable to the State, we find that a rational juror could have concluded that Miguel failed to prove imperfect self defense by a preponderance of the evidence. Therefore, we will not reduce his conviction to second degree murder.

¶ 33                        B. Miguel's Sentence Is Constitutional

¶ 34    Miguel also argues that his 40-year sentence is unconstitutional because it is a *de facto* life sentence that may only be imposed after a finding of permanent incorrigibility under *People v. Buffer*, 2019 IL 122327.

¶ 35    The eighth amendment to the United States Constitution prohibits excessive and disproportionate punishment, and this prohibition applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV. The United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460, 465 (2012), that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court declared the holding it had announced in *Miller* was a new substantive rule of constitutional law with retroactive effect. Because the Court determined in *Miller* "that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption" or "permanent incorrigibility," life without parole was rendered an unconstitutional penalty for an entire class of defendants—"juvenile offenders whose crimes [instead] reflect the transient immaturity of youth." (Internal quotation marks omitted.) *Id.* at 208, 209.

¶ 36    In 2016, our own supreme court extended *Miller*'s holding barring mandatory life sentences for juveniles to include mandatory *de facto* life sentences, sentences so long that they were the functional equivalent of life without parole. *People v. Reyes*, 2016 IL 119271, ¶ 9. And in 2017, it extended the holding to discretionary life sentences. *People v. Holman*, 2017 IL 120655, ¶ 40. The question remained, however, what length a sentence, mandatory or discretionary, must be to constitute a *de facto* life sentence. That question was answered in 2019, when the court decided *Buffer*, 2019 IL 122327. Noting that courts had "struggled to formulate an exact

10

calculation of a *de facto* life sentence," and that the issue remained very much unresolved, the court looked for guidance to recent legislation overhauling the sentencing scheme for juvenile defendants. *Id.* ¶¶ 32, 34, 36. It concluded from a provision in that new law that the General Assembly would draw the line at 40 years. *Id.* ¶¶ 37-41.

¶ 37    When the *Buffer* court drew this line, it made clear that any sentence over 40 years was a *de facto* life sentence and any "sentence of 40 years or less" imposed on a juvenile offender was not. *Id.* at ¶ 41. Miguel was sentenced to exactly 40 years of imprisonment and thus he did not receive a *de facto* life sentence. He therefore cannot prevail on his eighth-amendment claim—he did not receive a *de facto* life sentence.

¶ 38                C. Remandment for Resentencing Is Nevertheless Proper

¶ 39    Miguel also argues that, even if the 40-year sentence imposed here was not a *de facto* life sentence, this case should be remanded for resentencing, since the record indicates that the judge did not intend to impose on Miguel—whom she clearly found had rehabilitative potential—a sentence that was one day short of life in prison. We agree that the specific facts of this case require a remand.

¶ 40    Illinois Supreme Court Rule 366 provides that, "in its discretion, and on such terms as it deems just," this court may "grant any relief, including a remandment *** that the case may require." Ill. Sup. Ct. R. 366(a)(1), (5) (eff. Feb. 1, 1994). We have exercised this power to remand when the circumstances underlying a sentencing judge's exercise of discretion are called into question by subsequent events. For example, where one of several convictions is reversed on direct appeal, we will remand for resentencing where we cannot determine whether the conviction vacated could have influenced the circuit court in imposing sentences for the other convictions. See, *e.g.*, *People v. Alejos*, 97 Ill. 2d 502, 511 (1983); *People v. Figures*, 216 Ill. App. 3d 398, 404

(1991). The sentencing judge's analysis and comments in this case call into question whether she would have imposed a 40-year sentence if she had known that our supreme court would soon hold that this was the longest constitutionally permissible sentence available.

¶ 41    There can be no doubt that the sentencing judge concluded both that Miguel's crime reflected the transient immaturity of youth and that Miguel himself had significant rehabilitative potential. The judge stated at sentencing "there's certainly a lack of maturity here"; noted that she had "watched [Miguel] grow" over the six years she had presided over the case; and, commenting on his likelihood for rehabilitation, emphasized that Miguel, who had been going to school and working part time with his mother at a hospital, "was doing things with his life," had "never been in trouble before," did not "come to court with any history, juvenile history, nothing," and had had family there to support him at "each and every court date." The judge believed that with the sentence imposed, Miguel would be "young enough" upon release "to be rehabilitated and go on with his life after this tragic incident."

¶ 42    For purposes of applying the holding in *Miller*, our supreme court has drawn a clear line: sentences greater than 40 years are *de facto* life sentences; sentences of 40 years or less are not. *Buffer*, 2019 IL 122327, ¶ 40; see also *Gunn*, 2020 IL App (1st) 170542, ¶¶ 132-33 (observing that "[t]he *Buffer* court was aware that some defendants would fall close to the line that it was drawing, but it believed that a categorical, bright-line rule was nonetheless desirable"). We fully respect and appreciate that line and agree that a bright-line was desirable and necessary. In *Buffer* our supreme court made it clear both that this sentence was constitutional and that it was the longest sentence that could have been imposed, once a finding was made that Miguel had rehabilitative potential.

¶ 43    In light of the stark line our supreme court drew in *Buffer* and the unique facts of this case, we think the appropriate remedy is to remand. This record undermines any conclusion that this

sentencing judge saw Miguel as a mere hair's breadth away from being one of those "rare juvenile offender[s]" referred to in *Miller*, "whose crime reflects irreparable corruption" and who thus should be imprisoned for life. Miller, 567 U.S. at 479-80. Everything the sentencing judge said suggests just the opposite. She emphasized Miguel's complete lack of any juvenile record, knew that he had been in school and working before this crime, appreciated that he was "doing things with his life," and expressed her understanding that he would have a real opportunity to rejoin society. That understanding, however, was undercut by our supreme court's conclusion in *Buffer* that juveniles sentenced to more than 40 years had been given life sentences.

¶ 44    Miguel's sentence of 40 years was imposed after *Miller*, *Montgomery*, and *Holman* had been decided, but before our supreme court held in *Buffer* that any sentence exceeding 40 years was a *de facto* life sentence. The judge who sentenced Miguel thus could not have known that she was imposing the *most severe sentence available* for a juvenile offender whose crime reflected the immaturity of youth and who, by her own assessment, possessed rehabilitative potential. We have the power on this direct appeal to allow this sentencing judge to reconsider, in light of the altered significance of a 40-year sentence following *Buffer*, whether that is the sentence that she finds to be appropriate for this defendant.

¶ 45    The judge in this case took great care in imposing Miguel's sentence, holding a lengthy sentencing hearing and explaining carefully why she did not impose the gun enhancement and why she imposed the sentence that she did. Where, as here, the case is still pending on direct appeal, the legal landscape has shifted, such that this is now the lengthiest sentence that could have been imposed on this defendant, and the sentencing judge's statements call into question whether that is what she wanted to do in this case, it seems only fair to both the judge and to Miguel to allow the judge to reconsider the sentence in light of *Buffer*.

¶ 46    The dissent (*infra* ¶ 55) questions our statement that the 40-year sentence imposed on Miguel was the longest sentence that could have constitutionally been imposed. However, it clearly was. Given the sentencing judge's finding that Miguel had rehabilitative potential, any longer sentence would have violated the eighth amendment of the United States Constitution.

¶ 47    The dissent's suggestion that the eighth amendment is satisfied and sentences in excess of 40 years, although they are life sentences, can be imposed so long as "the attributes of youth are considered" (*infra* ¶ 55) rests on what we view as an incomplete understanding of the substantive rule imposed in the *Miller* line of cases. As noted above, the import of those cases is not just that youth must be considered, but that, except in rare cases, a life sentence cannot be imposed on a defendant who was a juvenile at the time of the crime.

¶ 48                                      III. CONCLUSION

¶ 49    For the foregoing reasons, the jury's finding of guilt on the charge of first degree murder is affirmed, Miguel's sentence of 40 years of imprisonment is vacated, and this case is remanded for resentencing.

¶ 50    Affirmed in part and reversed in part.


¶ 51    PRESIDING JUSTICE PIERCE, dissenting in part.

¶ 52    As the majority acknowledges, defendant was sentenced to exactly 40 years' imprisonment. Therefore, his sentence is not a *de facto* life sentence and does not implicate the constitutional sentencing issues concerning juveniles under *Miller* or *Buffer*. *Buffer* found that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Id.* at ¶ 41. See also *People v. Villalobos*, IL App (1st) 171512; *People v. Gunn*, 2020 IL App (1st) 170542.

¶ 53 Nevertheless, the majority has capitulated to defendant's argument that even if his 40-year sentence is not a *de facto* life sentence, which it clearly is not, it is "a mere one day away from being one," and thus we should remand for resentencing. This goes against everything our supreme court articulated in *Buffer*. Our supreme court in *Buffer* did not declare a sentence that is "one day short" or "close to" or "almost" more than 40 years a *de facto* life sentence. The *Buffer* court established a bright-line 40-year rule knowing that there were some defendants that would fall precariously close to the cut off. In *Gunn*, this court observed that "[t]he *Buffer* court was aware that some defendants would fall close to the line that it was drawing, but it believed that a categorical, bright-line rule was nonetheless desirable. *** The *Buffer* court stated that it understood that drawing a line was subject to the objections always raised against categorical rules, but nonetheless it decided 'a line must be drawn.' [Citation]." *Id.* at ¶¶ 132-133 (quoting *Buffer*, 2019 IL 122327, ¶ 29). Discussing the sentencing guidelines for juveniles implemented by the General Assembly in light of the U.S. Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. 460 (2012), as set forth in 730 ILCS 5/5-4.5-105 (West 2016), the *Buffer* court noted that the 40-year cut off "does not originate in court decisions, legal literature, or statistical data. It is not drawn from a hat. Rather, this number finds its origin in the entity best suited to make such a determination—the legislature." *Id.* at ¶ 40.

¶ 54 Mindful of the reasons expressed in our supreme court's decision, I find it incomprehensible that the majority feels compelled to remand this case for a new sentencing hearing, doing everything but telling the circuit court to change its mind, when *Buffer* was not violated in this case. Furthermore, the fact that the circuit court clearly articulated and considered both the mitigating and aggravating factors and carefully considered defendant's age, potential for rehabilitation, and other characteristics of youth before she imposed his 40-year sentence shows

15

an exercise of her considered judgment and discretion. This is also shown by the court's decision to not impose a maximum sentence of 60 years and, significantly, refusing to impose a discretionary firearms enhancement of 25 years.

¶ 55    I also find no justification for the remand under Rule 366 under the guise of the trial court having abused its discretion in the sentence it imposed. Ill. Sup. Ct. R. 366(a)(1), (5) (eff. Feb. 1, 1994). There has been no finding of an abuse of discretion *(Supra* ¶ 40), nor could there be because the sentence in question falls within the range authorized by the legislature. And the majority is also wrong in declaring that the 40-year sentence is the maximum sentence that could be constitutionally imposed (*Supra* ¶ 40). *People v. Holman*, 2017 IL 120655. The majority well knows a sentence in excess of 40 years imposed on a juvenile is permissible as long as the attributes of youth are considered. *Id.* ¶ 46. As we stated in *People v. Croft*, "a key feature of the juvenile's sentencing hearing is that the defendant had the 'opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.' " *Croft*, 2018 IL App (1st) 150043, ¶ 23 (quoting *Holman*, 2017 IL 120655, ¶ 49). In my view, even though *Miller* and *Buffer* do not apply, under *Holman* the record on appeal in this case is unquestionably sufficient to find without question that the circuit court considered defendant's age, social history, educational history, and criminal history and the jury's rejection of the defense of self-defense in imposing a sentence that was appropriate for the brutal execution underlying his sentence.

¶ 56    Finally, the majority finds comfort in the concept that *de facto* life sentences for a juvenile can only apply to that "rare" individual who warrants such a sentence. The term "rare juvenile" was coined in the context of mandatory life sentencing. I have yet to understand just what a "rare" juvenile means in the context of discretionary sentencing. Shooting someone in the face with a shotgun seems to me to be something a "rare" juvenile would do. This was no accident, and the

jury unanimously found defendant guilty of first degree murder. "Rare" in what context or cohort? It cannot mean that all juveniles convicted of murder are "rare" and cannot be sentenced to a discretionary *de facto* life sentence because the Supreme Court and our supreme court allow discretionary *de facto* life sentences for juveniles. Is it because the particular juvenile is "rare" among all juveniles in the world, country, state or county? Or is a juvenile "rare" because he is merely a fraction of the juvenile population charged with the most serious of offenses? It seems obvious that most, if not all, discretionary sentences of more than 40 years for a juvenile are "rare" but constitutionally permissible. Most, if not all, juvenile defendants are sentenced based on the unique facts and circumstances of their crime and their background. To say a particular juvenile is not that "rare" individual eligible for a discretionary *de facto* life sentence means nothing without defining the universe he inhabits and describing what makes him "rare." Like all imposed discretionary sentences, it is the trial court that considers the sentencing options set by the legislature and melds those considerations with the juvenile's background when imposing sentence, and as long as youth and its attributes are considered, *de facto* life sentences are constitutionally permitted. Defendant, a seventeen year old, intentionally shot the decedent in the face twice with a shotgun. The jury rejected his defense of self-defense. This is a "rare" juvenile who received a discretionary non-*de facto* sentence which should be affirmed on appeal.

¶ 57    For these reasons, I respectfully dissent.